**FARMINGTON DOWEL PRODUCTS
CO., Plaintiff,**

v.

**FORSTER MFG. CO., Inc., et al.,
Defendants.**

**Nos. 7324, 7334.**

United States Court of Appeals,
First Circuit.

Dec. 10, 1969.

Supplemental Order Feb. 12, 1970.

Robert W. Meserve, Boston, Mass., with whom John R. Hally, Thomas B. Merritt, and Nutter, McClennen & Fish, Boston, Mass., were on brief, for Forster Mfg. Co., Inc., et al.

Earle C. Cooley, Boston, Mass., with whom C. Keefe Hurley and Hale & Dorr, Boston, Mass., were on brief, for Farmington Dowel Products Co.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This case comes to us on cross-appeals from a final judgment in which the district court, on the basis of a special jury verdict, held that defendants Forster Mfg. Co. and Theodore R. Hodgkins [1] violated section 2 of the Sherman Act and section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, by their use of various discriminatory pricing practices. The jury also found that these violations injured Farmington Dowel, a competing manufacturer of wooden skewers, in the amount of $109,100, which amount was trebled by the district court and awarded to Farmington. The district court refused, however, because of the particular fee arrangement which Farmington had with its counsel, to award the $85,000 found by the court to be a "reasonable attorney's fee" in this case.

During the trial in the district court, Farmington sought to introduce into evidence various opinions and orders [2] of the Federal Trade Commission against Forster which had finally culminated in a finding that Forster had violated section 2(a) of the Clayton Act, as amended, by its discriminatory pricing practices,[3]

---

1. Theodore R. Hodgkins was the president of Forster Mfg. Co. at all times relevant to this litigation. These two individually-named defendants will be treated as one and referred to as Forster throughout this opinion.

2. See n. 40, infra.

3. The Federal Trade Commission first issued a complaint against Forster on July 23, 1958. The Commission hearing examiner found that Forster had violated

section 2(a) of the Clayton Act by its use of discriminatory pricing practices, which finding was affirmed by the Commission. Subsequently, we remanded the case for further proceedings before the Commission. Forster Mfg. Co. v. FTC, 335 F.2d 47 (1st Cir. 1964), cert. denied, 380 U.S. 906, 85 S.Ct. 887, 13 L.Ed.2d 794 (1965). However, the new order of the Commission, again finding that Forster had violated section 2(a) of the Clayton Act, was affirmed by us. For-

After thoughtful consideration, the district court concluded that the part of the final Commission order which related to wooden skewers could properly be admitted as prima facie evidence against Forster pursuant to section 5(a) of the Clayton Act.[4] Forster brings this appeal to contest the propriety of that ruling by the district court. Thus, we find ourselves confronted with the difficult question specifically left open by the Supreme Court in Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965) [hereinafter *3M*]: whether a final Commission order can be admitted as prima facie evidence pursuant to section 5(a) of the Clayton Act. Farmington also challenges the court's decision as to the order, claiming that Commission findings on a variety of additional points should also have been admitted. Other issues are presented by Farmington's objections to the court's rulings excluding proffered evidence of damages; Forster's attack on the sufficiency of evidence as to damages; and Farmington's objections to the court's refusal to award counsel fees.

## ADMISSIBILITY OF A FINAL COMMISSION ORDER

■ The Clayton Act's section 5 twins (a) and (b) [5]—now determined by the Supreme Court in *3M* to be fraternal, not identical—were enacted over a half century ago as part of a Congressional effort to enable the private antitrust litigant to contribute significantly to the antitrust enforcement efforts of the Justice Department while at the same time recovering the damages inflicted on him by the antitrust violator. *3M, supra* at 318–319, 85 S.Ct. 1473. The treble damage recovery was offered in the Clayton Act as a major inducement to the private litigant to accomplish these dual objectives. Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 751–752, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). As a further step against antitrust violators, the very same session of Congress created a new administrative agency—the Federal Trade Commission—to act as the third major arm of antitrust enforcement.[6] Yet a question never clearly resolved by either Congress or the Supreme Court was the extent to which these two new agents of antitrust enforcement would

ster Mfg. Co. v. FTC, 361 F.2d 340 (1st Cir. 1966), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), reh'g denied, 387 U.S. 938, 87 S.Ct. 2047, 18 L.Ed.2d 1007 (1967).

4. Clayton Act § 5(a), 38 Stat. 731 (1914), as amended, 15 U.S.C. § 16(a) (1964), in relevant part:
 "(a) A final judgment or decree * * * rendered in any civil or criminal proceeding brought by * * * the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant * * * as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto; *Provided*, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken * * *."

5. Section 5(a), reproduced in part in n. 4, *supra*, provides the private litigant with

prima facie evidentiary assistance in certain circumstances. Section 5(b), reproduced in part below, tolls the statute of limitations for private litigants:

 "(b) Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, * * * the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter * * *."

6. Federal Trade Commission Act, 38 Stat. 717 (1914), as amended, 15 U.S.C. § 41 *et seq.* (1964). *See* Henderson, The Federal Trade Commission, pp. 16–28 (1924).

work together to accomplish their common purpose. The prevailing view for many years was that, despite their common heritage and purpose, the private litigant could get no evidentiary assistance from the Commission pursuant to section 5(a).

The gospel was written in 1923 in *Proper v. John Bene & Sons, Inc.,* 295 F. 729 (E.D.N.Y.), wherein the district court concluded, for many reasons,[7] that a Commission order could not be admitted pursuant to section 5(a). This holding was religiously followed in the few subsequent cases concerning the admissibility of a Commission order in this context. *See* n. 8, *infra.* Only the Second Circuit—paradoxically, *John Bene's* circuit—in Brunswick-Balke-Collendar v. American Bowling & Billiard Co., 150 F. 2d 69 (2d Cir. 1945), rev'd in part on rehearing, 150 F.2d 74, cert. denied, 326 U.S. 757, 66 S.Ct. 99, 90 L.Ed. 455 (1945), in a divided opinion, strayed

from the fold by concluding that a final Commission order fell within section 5(a), which decision necessarily rejected all of the objections of the district court in *John Bene.* Having discovered on rehearing, however, that amendatory legislation giving finality to certain Commission orders did not apply to the case at bar, Judge Frank was compelled to withdraw this portion of his initial opinion—solely because of a lack of the finality which section 5(a) requires. Notwithstanding this single objection to admissibility raised by the Second Circuit, which has traditionally commanded an attentive audience, most judges and commentators continued to rely on the earlier district court decision in *John Bene,* with its multiple objections, for the proposition that neither section 5(a) nor section 5(b) applied to Commission proceedings and orders.[8]

It was against this background that the Supreme Court decided *3M* in 1965. The

---

7. The court set forth six reasons why the Federal Trade Commission order before it could not be admitted pursuant to section 5(a). *First,* the Commission's order lacked finality: "The result of the proceedings before the Commission is an order which has no effect in itself, unless made operative by the Circuit Court of Appeals, which has power of review." *John Bene, supra* at 731. *Secondly,* a Commission proceeding was not a "proceeding in equity" as the statute then required. *Thirdly,* a Commission proceeding was not brought by or on behalf of the United States. *Fourthly,* the Commission order in that case was apparently that the defendant had violated the Federal Trade Commission Act, which has never been considered an "antitrust law" as that term is used in section 5(a). Thus, the order was not "under the antitrust laws". *Fifthly,* for the same reason, there was thus no finding "to the effect" that the defendant had violated an "antitrust law". *Finally,* the order itself was only against John Bene & Sons, Inc., but the plaintiff wanted to offer it against several additional defendants in the subsequent suit.

It should be noted at this point that while these six prerequisites to admissibility still exist with minor changes of wording, only the first three are relevant to our case. Here, the Commission order

was "to the effect" that Forster had violated section 2(a) of the Clayton Act (rather than the Federal Trade Commission Act as in *John Bene*) which is clearly an "antitrust law". 15 U.S.C. §§ 12 and 44 (1964); Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958). Moreover, Farmington seeks to introduce the order only against those defendants named in the order.

8. International Tag & Salesbook Co. v. American Salesbook Co., 6 F.R.D. 45, 48 (S.D.N.Y.1943); United States v. United Shoe Machinery Corp., 89 F.Supp. 349, 356 (D.Mass.1950); Wendel Shoes, Inc. v. Shoenterprise Corp., 1958 Trade Cas. ¶ 69,132 (N.Y.Sup.Ct.); Highland Supply Corp. v. Reynolds Metals Co., 221 F.Supp. 15, 17 (E.D.Mo.1963), rev'd on other grounds but aff'd on issue at bar, 327 F.2d 725 (8th Cir. 1964), on remand, 245 F.Supp. 510 (E.D.Mo.1965); Volasco Products Co. v. Fry Roofing Co., 223 F.Supp. 712 (E.D.Tenn.1963); Farmington Dowel Products Co. v. Forster Mfg. Co., 223 F.Supp. 967 (D.Me.1963).

Bronstein & Miller, Regulation of Trade: A Case and Textbook, 1106 (1953). Beer, Federal Trade Law and Practice, 429, n. 53 (1942); 2 Toulmin's Anti-Trust Laws, 118 (1949).

issue presented to the Court was whether the institution of a Commission proceeding satisfied section 5(b) of the Clayton Act, which section tolls the statute of limitations for private litigants "whenever any civil or criminal proceeding is instituted by the United States." The district court held that those words did include a Commission proceeding, suggesting that section 5(a) and section 5(b) did not have an identical reach.[9] The Third Circuit upheld the application of section 5(b) to Commission proceedings, but in something between a dictum and an alternative ground concluded that section 5(b) and section 5(a) operated on common subject matter: the kind of proceeding that could toll the limitations period under section 5(b) could result in a "final judgment" that would be prima facie evidence under section 5(a).[10] The Supreme Court, on this posture of the case,[11] explicitly refrained from deciding whether a final Commission order satisfied section 5(a); it did affirm the holdings of the courts below that a Commission proceeding tolled the statute of limitations for purposes of section 5(b).

In so doing, the Court understandably attached "crucial significance" to the words "final judgment or decree" in section 5(a), *3M, supra* at 316, 85 S.Ct. 1473 for a consent order entered before the taking of testimony such as the one before the Court in *3M* could not be equated with a "final judgment or decree" by the very terms of section 5(a).[12] Accordingly, it was necessary for the Court to stress that:

> " § 5(b) tolls the statute of limitations set out in § 4B from the time suit is instituted by the United States *regardless of whether a final judgment or decree is ultimately entered.* Its applicability in no way turns on the success of the Government in prosecuting its case." *3M, supra* at 316, 85 S.Ct., at 1476. [Emphasis added.]

It seems clear that what the Court recognized here was that the Commission consent order against *3M* was not a final judgment; it was not saying that an order terminating a fully litigated case could not be.

The Court did observe that Congress' purpose in adopting section 5(b) was broader than its purpose behind section 5(a), *3M, supra* at 317, 85 S.Ct. 1473, but despite the greater delicacy of section 5(a)—which we acknowledge—it seems clear that the same ultimate purpose underlies both sections. Because the assistance to the private litigant may even be greater under section 5(a), we would think that only a strong countervailing

9. New Jersey Wood Finishing Co. v. Minnesota Mining & Manufacturing Co., 216 F.Supp. 507 (D.N.J.1963).

10. New Jersey Wood Finishing Co. v. Minnesota Mining & Manufacturing Co., 332 F.2d 346 (3rd Cir. 1964).

11. In argument before the Supreme Court, the positions of the parties and amici varied. The petitioner (defendant in the district court), while conceding in its brief that section 5(a) was not "directly involved", nevertheless endeavored to tie the two sections together as the product of one dominant Congressional intent— to deal with proceedings in court. The respondent on certiorari (plaintiff in the district court) never conceded that the two clauses were interdependent or in *pari materia*. Almost one fourth of its brief on the issue of tolling was devoted to arguing that the two were not coextensive. It then proceeded, arguendo, to contend that section 5(a) applied to Commission orders. The United States, as amicus, devoted a major part of its brief in support of the Third Circuit decision to asserting the irrelevancy of section 5(a) in deciding the applicability of section 5(b). It also conceded for the purposes of the case that section 5(a) did not apply to Commission orders. Private amici, contending with each other in the Eighth Circuit, predictably took opposite tacks; one devoted 64 pages to trying to demonstrate equivalence between sections 5(a) and (b), while the other asserted a lack of interdependence.

12. The section 5(a) proviso specifically excepts "consent judgments or decrees entered before any testimony has been taken." The Third Circuit opinion in *3M*, 332 F.2d at 349, indicates that the Commission order against *3M* was such an order.

policy should limit the application of section 5(a).

Having suggested these differences in the wording and policy of the two subsections, the Court developed a three-fold rationale to explain its conclusion regarding section 5(b). It construed the early Congressional debate as supplying no "substantial evidence" that Commission action was specifically excluded from the operation of section 5(b) as a ground for tolling, *3M, supra* at 320, 85 S.Ct. 1473; it gave greater weight to the "one element of congressional intention which is plain on the record—the clearly expressed desire that private parties be permitted the benefits of prior government actions", *3M, supra* at 320, 85 S.Ct., at 1478; and, in minor key, it rejected an approach which "would make enjoyment of these intended benefits turn on the arbitrary allocation of enforcement responsibility between the Department [of Justice] and the Commission." *3M, supra* at 320, 85 S.Ct., at 1478. Accordingly, the Court equated Commission proceedings and Justice Department actions so far as section 5(b) is concerned.

The latter two points apply as fully to our case as to *3M*; concerning the first point, we conclude below that the 1914 Congressional debates erect no greater obstacle to applying section 5(a) to Commission proceedings. Yet we do not understand the reasoning of *3M* to compel or to prevent the application of section 5(a) to final Commission orders. We focus instead on the prerequisites to admissibility to see what has been resolved and what has not. Section 5(a), in relevant part, reads:

"A final judgment or decree * * * in any civil or criminal proceeding brought by * * * the United States

under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant * * *."

■ First of all, we do believe that *3M* necessarily held that a Commission proceeding is a "civil or criminal proceeding brought by the United States" for purposes of section 5. We agree with the district court that it is inconceivable that these very same words in the immediately preceding section 5(a) could have a different meaning than they were declared by *3M* to have in section 5(b), at least in the absence of compelling legislative history to the contrary, of which there is none here. Moreover, since the Commission order against Forster in this case was pursuant to section 2(a) of the Clayton Act, it was clearly "under the antitrust laws to the effect that a defendant has violated said laws". Thus, the only remaining problem under section 5(a) is whether the Commission order was a "final judgment or decree".

We believe that this question requires a brief review of the evolution of the Commission's responsibilities, powers, and activities since its creation in 1914.[13] In 1938, the Wheeler-Lea amendments to the Federal Trade Commission Act made Commission orders concerning violations of that Act final and enforceable without an implementing decree from the courts of appeals.[14] Subsequently, Congress gave the Commission power to formulate substantive rules governing practice in certain industries.[15] In 1950, Congress amended section 7 of the Clayton Act regarding asset acquisitions and mergers,[16] thereby, *inter alia*, "explicitly enlarg[ing] the FTC's jurisdiction" over such matters.[17] Moreover, by 1962, it had

---

13. Indeed, such evolution was within the contemplation of the Congress which had created it. *See* remarks of Cong. Covington, Chairman of the House Interstate and Foreign Commerce Committee, 51 Cong.Rec. 8849 (1914).

14. 52 Stat. 111 (1938), 15 U.S.C. § 45 (g–l) (1964).

15. e. g., 54 Stat. 1128 (1940), 15 U.S.C. § 68d (1964) (wool products) ; 65 Stat.

175 (1951), 15 U.S.C. § 69f (1964) (fur products) ; 67 Stat. 111 (1953), 15 U.S.C. § 1194 (1964) (flammable fabrics).

16. Celler-Kefauver Antimerger Act, 64 Stat. 1125 (1950), 15 U.S.C. § 18 (1964).

17. United States v. Philadelphia National Bank, 374 U.S. 321, 348, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

become clear that the Justice Department had generally deferred to the Commission for the enforcement of the Robinson-Patman Act.[18] Finally, the past fifty years has evidenced a widespread expansion of the adjudicative functions of federal administrative agencies,[19] including the Federal Trade Commission.[20]

Yet perhaps the most significant indication of the Commission's maturation was the Congressional enactment of the Finality Act of 1959.[21] Up to that time the Commission was held to the rules of baseball: it had to make three pitches to strike out a batter.[22] The first violation of the antitrust laws could lead to a Commission cease and desist order; a second violation was required for a circuit court order of enforcement; still a third violation was necessary to trigger a contempt proceeding. The apparent justification in 1914 for such a redundant procedure was a healthy uncertainty about the quality of Commission adjudications and thus a desire to inject the courts into Commission adjudication as often as possible.

But as Congressional reliance on the Commission increased through the years, the justification for this cumbersome procedure disappeared. The Finality Act of 1959 thus made a Commission order final and enforceable as such unless appealed to a court of appeals within 60 days. Implicit in the thinking behind this change was a belief that the Commission had come of age: its orders now have legal significance without the necessity of court affirmance. For example, an unappealed Commission order can serve as the unimpeachable basis for a Justice Department suit for violation of such order, resulting in substantial fines.[23]

We understand the Finality Act to be significant to our issue for two reasons. First, we believe that that Act, when read in conjunction with *3M*, fully discredited all of the case authority against Commission order admissibility under section 5(a). *John Bene* and its progeny had relied on three objections to admissibility which are relevant to a Commission order under the Clayton Act.[24] *3M* dispelled two of those objections by holding that a Commission proceeding was a "civil or criminal proceeding" which is "brought by the United States". The Finality Act of 1959 eliminated the remaining objection in *John Bene*—no finality—and also supplied the sole ingredient found lacking in the *Brunswick* decision on rehearing.

■ Secondly, we see the Finality Act as making final the Commission order which was admitted by the district court below.[25] Thus, the specific statutory

---

18. Report of the ABA Commission to Study the Federal Trade Commission, (September 15, 1969), pp. 6, 64; Rockefeller and Wald, "Antitrust Enforcement by the Federal Trade Commission and the Department of Justice: A Primer for Small Business", 62 Dick, L.Rev. 251, 254 (1962).

19. Davis, Administrative Law Treatise, Vol. I, § 1.02 (1958 ed.).

20. Annual Reports of the Federal Trade Commission, 1966, 1967, 1968.

21. 73 Stat. 243 (1959), 15 U.S.C. § 21 (g–l) (1964).

22. *See* H.R.Rep.No. 580, 86th Cong., 1st Sess. (1959).

23. 15 U.S.C. § 21(*l*) (1964).

24. *See* nn. 7–8, *infra*.

25. 15 U.S.C. § 21(g) (3)—the present codification of the Finality Act—so provides. In a footnote, however, Forster contends that in light of FTC v. Jantzen, 386 U S. 228, 87 S.Ct. 998, 18 L.Ed.2d 11 (1967), the Finality Act of 1959 would not apply to the Commission order of July 23, 1965 which was admitted below, simply because the Commission proceeding was instituted prior to the enactment of the Finality Act. We cannot agree.

*Jantzen* involved a Commission order entered *prior* to the enactment of the Finality Act, not afterwards as in our case. The entire thrust of the Court's opinion is directed at pre-1959 orders. The Court seemed to rely essentially on two reasons for its holding that the Act did not apply to pre-1959 orders. First, because of the heavy penalties which can

question remaining—and what Forster in argument properly called "the crux" of this case—is whether a final Commission order is a "judgment or decree". Underlying that specific question, we sense a broader question: is it fair to give prima facie evidentiary effect to a final Commission order against a defendant?

Were we to proceed semantically, we would have to acknowledge that these words "judgment or decree" historically have referred only, or chiefly, to courts. *But see* n. 38, *infra*. But as the Supreme Court recognized in *3M*, a question concerning the meaning of section 5 probes more deeply than an exercise in etymology.

We begin with the 1914 debates. They are exhaustive, if not exhausting. An index of the discursiveness is that the House of Representatives allowed sixteen hours of general debate for the Clayton

bill. 51 Cong.Rec. 9068 (1914).[26] The Clayton bill and the bill which resulted in the creation of the Federal Trade Commission occupied a large part of the spring and summer of 1914.

It is undoubtedly true that most of the participants in these debates who thought at all about the source of the judgments to be used in subsequent proceedings thought of court proceedings. A court of record was their common experience. Yet our attention has not been directed to a single instance during which the exact nature of the first proceeding was directly before the legislators as the subject of their attention. Instead, the "day in court" terminology which appears frequently simply evolved into the most common shorthand means of referring to the first proceeding. The "day in court" references, when put into context, are thus not overly helpful.[27]

be visited on the violator of a final Commission order, Congress felt it unfair to use the Finality Act retroactively so as to finalize pre-existing Commission orders. 386 U.S. at 233–234, 87 S.Ct. 998. Yet no such unfairness results by applying the Finality Act prospectively to finalize orders entered after July 1959. *See* Sperry Rand Corp. v. FTC, 110 U.S. App.D.C. 1, 288 F.2d 403 (1961), cited with approval in *Jantzen*, for an excellent discussion of this point.

Secondly—and apparently more importantly—the Court recognized that a failure to apply the old enforcement procedures to pre-1959 orders would mean that such orders could not be enforced at all. 386 U.S. at 234, 87 S.Ct. 998. As a result, some 400 violators would have been absolved from Commission orders and the Commission would have to begin anew against all 400. Yet no such unsatisfactory result occurs by applying the Finality Act to orders entered after its passage. On the contrary, to apply the old procedures to all Commission proceedings begun before July 1959, would significantly postpone the operation of the Act. For example, in our case, the Commission would be required to use the "laborious, time consuming, and very expensive" 3-step enforcement procedure rejected by Congress in 1959, S.Rep. No. 83, 86th Cong., 1st Sess., 2 (1959), to enforce an order entered a full six years after the new procedures were enacted. Such a

result is wholly inconsistent with the legislative purpose of expediting the enforcement of Commission orders. The only sensible construction of the Act would be to apply it as soon as the fairness consideration mentioned above would allow. S.Rep. No. 83, *supra*. Accordingly, we conclude that both the holding in *Jantzen* and its rationale were necessarily confined to pre-1959 orders, and that the legislative purpose demands that the Finality Act be applied to post-1959 orders such as the one admitted below. We believe that the *Sperry Rand* decision mentioned above fully supports our conclusion. We find no cases suggesting the contrary.

26. The Congressional Record indicates at 9068 that the proponent of the original bill was allotted eight hours for general debate. It is our understanding from the Congressional Record that the opponents also consumed eight hours.

27. We note two instances where material quoted to us has a different meaning when viewed in fuller context. First, emphasis has been placed by Forster in its brief on an exchange between Senators Sutherland and Crawford concerning an amendment to the Federal Trade Commission Act:

"Mr. Sutherland. * * * So far as the findings of the commission are concerned, I do not think they ought to be evidence anywhere.

Much discussion, for example, concerned the House proposal to make final judgments conclusive evidence. This proposal came under inquiry, particularly when it became apparent that judgments in favor of defendants might bar subsequent plaintiffs. At times, the discussion focused on the propriety of foreclosing plaintiffs who had never filed a paper, much less had a "day in court". 51 Cong.Rec. 9169, 9200, 13900 (1914). There was fear of being foreclosed by an incompetent, weak, or corrupt Attorney General who might, by participating in collusive judgments, effectively deny future plaintiffs their "day in court". 51 Cong.Rec. 9489, 9492 (1914). That aspect of the bill was soon eliminated.

At other times the "day in court" reference appeared in the discussions about whether the effect under section 5(a) should be conclusive or prima facie against defendants, e. g., 51 Cong.Rec. 13853 (1914), which was resolved in favor of prima facie effect. Finally, the phrase was used in the discussions that a defendant should have a "day in court" before section 5(a) is used against him in a subsequent proceeding. This "day in court" concern found its way into the statute in the words "final judgment or decree".

Yet it seems reasonably clear from the focus and the context of these discussions that the Congressmen in 1914 were not thinking in terms of the particular institutions which would satisfy their "day in court" assurance for defendants. We have found very few specific references in the legislative history of section 5(a) to either the federal district courts or the Federal Trade Commission or any other particular institution.[28] Rather

"Mr. Crawford: I do not, either.
"Mr. Sutherland. I doubt very much whether we could make them evidence." 51 Cong.Rec. 12789–90 (1914).
Yet this brief exchange is less persuasive when placed in context. The amendment, proposed by Senator Cummins of Iowa and accepted by Senator Newlands for the Interstate and Foreign Commerce Committee, provided:
"That no order or finding of the court or commission in the enforcement of this section shall be admissible as evidence in any suit, civil or criminal, brought under the antitrust laws." 51 Cong.Rec. 12726 (1914).
The reason for the amendment was not that an order of the Commission was not of the dignity of that of a court but that
"The order of the court or the commission * * * would be simply that the defendant had been guilty of unfair competition [i. e., not restraint of trade, monopoly, or attempt to monopolize]. * * * It is the purpose of this amendment to prevent the judgment in one case [i. e., unfair competition] becoming res adjudicata in the other case [i. e., monopoly]." 51 Cong.Rec. 12787 (1914) (remarks of Sen. Cummins).
This amendment passed the Senate by a vote of 40 to 13. 51 Cong.Rec. 12804 (1914). Although it did not find its way into the final bill in that form, the Senate had equated orders of the Commission with those of a court. Moreover, the underlying assumption must have been

that orders of the Commission, unless specifically banned, could be evidence in subsequent civil or criminal proceedings.
Secondly, our attention has been directed to the following remark by Senator Walsh, the spokesman for the Judiciary Committee, which appears at 51 Cong. Rec. 13856–13857:
"I want to say just a word with reference to the authorities to which the attention of the Senate has been invited. * * * Nobody questions them. They all lay down the rule that in an action brought against an individual who has never theretofore had his day in court you can not make a certificate or a recital or an order of an administrative board or anything of that kind conclusive evidence against him."
However, in his very next sentence, Senator Walsh states that "You may make it [i. e., the order of an administrative board] prima facie evidence." Thus, even in 1914, it was recognized that a Commission order could be given prima facie effect.
Of course the statute as eventually enacted contained the prima facie evidentiary effect which Senator Walsh had said could properly be given to administrative orders. One can only conjecture why Senator Walsh did not later point out that the bill as changed could include administrative orders as well as court orders.

28. A few isolated references to juries have been brought to our attention—e. g., 51 Cong.Rec. 13900, 13901 (1914)—but since

than attributing to the 63rd Congress an intention *to forever circumscribe the effect of orders of the new institution it was creating,* we are drawn to the conclusion that Congress was using the "day in court" terminology more in the generic sense of a full opportunity to be heard and have one's case determined with finality in a proceeding in which fairness is assured.

Moreover, unlike Forster, we do not understand our function to be simply to speculate what Congress would have done had it squarely addressed this issue in 1914. Rather, we deem particularly pertinent Llewellyn's observation concerning the interpretation of statutes long on the books:

> "Here the quest is not properly for the sense originally intended by the statute, for the sense sought originally to be *put into it,* but rather for the sense which *can be quarried out of it* in the light of the new situation." (Emphasis in the original.)[29]

Accordingly, we conclude that the critical question is whether the procedural safeguards of the Commission are substantial enough to assure the defendant the "day in court" which the authors of section 5(a) intended for him before that section was applied against him.

The Commission's Rules of Practice today, while not so extensive as the Federal Rules of Civil Procedure, provide for litigants a substantial body of rights and privileges. Having been substantially revised in 1961 and partly revised in 1967, they address themselves to all stages of a proceeding: pleadings, prehearing procedures, discovery and compulsory process, hearings, decision and appeal, and reopening. 16 C.F.R. §§ 3.1 *et seq.*

More specifically, they require a clear factual statement in the complaint and provide for motions for more definite statement; a public notice and a public hearing, with interventions allowed where proper; any party may request admissions, depositions, and subpoenas;[30] objections to access to files, depositions, and subpoenas may be preserved and, where cause is shown, prosecuted by interlocutory appeal; all parties have the right to appear with counsel, cross-examine, present evidence, make objections, motions, argument and are assured of "all other rights essential to a fair hearing", § 3.41(c); and review of the hearing examiner's decision by the Commission is of right. In addition, of course, any defendant who loses before the Commission has the right to have the Commission's order reviewed by a Court of Appeals, wherein he will receive a full review of the relevant law and a review of the factual record for "substantial evidence". Only after all this will he be confronted with prima facie evidence against him pursuant to section 5(a).

In this regard, Forster's principal objection seems to be to the fact that the Commission's more liberal rules of evidence allow the inclusion of hearsay. The key provision relating to reception of evidence is section 3.43(b), which

---

it has long been accepted that a judgment in a non-jury trial is admissible under section 5(a)—e. g., Hanover Shoe v. United Shoe Machinery, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)—those few references cannot be said to limit the reach of section 5(a).

29. K. Llewellyn, The Common Law Tradition—Deciding Appeals, 374 (1960) Professor Llewellyn continues:

"Broad purposes can indeed reach far beyond details known or knowable at the time of drafting. A 'dangerous weapon' statute of 1840 can include Tommy guns, tear gas, or atomic bombs. 'Vehicle,' in a statute of 1840, can properly be read, when sense so suggests, to include an automobile, or a hydroplane that lacks wheels. But for all that, the sound quest does not run primarily in terms of historical intent. It runs in terms of what the words can be made to bear, in making sense in the new light of what was originally unforeseen." *See also* Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 395–396, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, J., concurring).

30. *See* Antitrust Developments 1955–1968, pp. 248–251 (1968).

states: "Relevant, material, and reliable evidence shall be admitted. Irrelevant, immaterial, unreliable, and unduly repetitious evidence shall be excluded." That this provisions does not exclude hearsay evidence is obvious. But that this implies such a major departure from procedure in the courts as to be the basis for different treatment for those two arms of the enforcement system envisaged by the Clayton Act is not obvious. We think that at most any difference of policy or practice between the courts and the Commission regarding hearsay is one of degree and unlikely to be dispositive. In United States v. United Shoe Machinery Corp., 89 F.Supp. 349, 355 (D.Mass.1950), Judge Wyzanski stated:

"[I]n a civil anti-trust suit in which the Government can secure against a defendant at most an injunction and order without monetary damages, * * * the trial judge is not required to exclude every type of hearsay evidence which would be excluded in other types of cases. * * * So far as this Court is aware, the Supreme Court has never either reversed or criticized a trial court for admitting hearsay evidence in a civil anti-trust case tried without a jury." [31]

Professor Davis has remarked favorably both on this decision and on the trend away from the rigidity of exclusionary rules and toward the discretionary inclusion of reliable evidence.[32] It is also worthy of note that the final judgment entered by Judge Wyzanski in the aforementioned case was the judgment which was given prima facie effect under section 5(a) in the Supreme Court's recent decision in Hanover Shoe Co. v. United Shoe Machinery, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), indicating that liberalized rules of evidence do not impede the operation of section 5(a).

■ Forster in passing notes that there is not a complete separation of the decision-making and prosecutorial functions within the Commission. We recognize that the Commission has an internal separation of functions rather than the complete separation characteristic of the NLRB.[33] However, the Interstate Commerce Commission, whose reparation orders are prima facie evidence in subsequent suits by private litigants, 49 U.S.C. § 16(2) (1964), has the same type of internal separation as the Federal Trade Commission. Moreover, there are specific provisions requiring a careful separation of Commission hearing examiners from other Commission employees.[34] If such internal separation does not comport with due process, we fail to see how a defendant can properly be fined for violating a final Commission order. 15 U.S.C. § 21(l) (1964). We conclude that as a general rule an internal separation of functions is consistent with the demands of due process.[35]

31. *Accord*: United States v. E. I. DuPont de Nemours & Co., 11 F.R.D. 132, 135 (D.Del.1951); United States v. Minnesota Mining & Manufacturing Co., 92 F. Supp. 947, 958–959 (D.Mass.1950).

32. Davis, Administrative Law Treatise, Vol. 2, § 14.01 (1958).

33. *Ibid.*, § 13.05.

34. E. g., 16 C.F.R. § 3.42(f), which provides:
"In the performance of their adjudicative functions, hearing examiners shall not be responsible to or subject to the supervision or directive of any officer, employee, or agent engaged in the performance of the investigative or prosecuting functions for the Commission, and all direction by the Commission to hearing examiners concerning any adjudicative proceeding shall appear in and be made a part of the record."

35. Davis, Administrative Law Treatise, Vol. 2, § 13.02 (1958 ed.) and 1965 Pocket Part. *Cf.* Pangburn v. CAB, 311 F.2d 349 (1st Cir. 1962).
Forster also attaches some significance to the fact that one does not have the benefit of Article III judges when one is before the Commission. Yet we know of no cases saying that due process can only be dispensed by Article III judges. On the contrary, it seems clear that procedural due process is accorded defendants before the Federal Trade Commission. We note also that the Supreme Court has accorded the Commissioners an element of protection from the political

The Commission, we recognize, has been a consistent target of criticism. The recent report of a study group of the American Bar Association on the Federal Trade Commission expressed the hope that "it should be the last of the long series of committees and groups which earnestly insisted that drastic changes were essential to recreate the F.T.C. in its intended image." Report of the ABA Commission to Study the Federal Trade Commission, p. 3 (1969). But it is significant to note that in this generally critical report—aimed primarily at too little action rather than overzealous action—the Association's study group singled out as one aspect of Commission operations in which there had been improvement its efforts to improve its rules of practice and procedures. ABA Report, pp. 34–35. We do not mean to suggest that further improvement is not desirable. All we say is that the difference in ground rules facing defendants in court and Commission proceedings is not so significant as to warrant the exclusion of final decisions in the latter from the prima facie evidentiary effect of section 5(a).

Concerning the broader question of the fairness of our result, we think the answer was provided over a half century ago. Speaking with regard to a statute which makes a reparation order of the Interstate Commerce Commission admissible as prima facie evidence in a subsequent private action for damages by a shipper against the offending carrier,[36] the Supreme Court in Meeker & Co. v. Lehigh Valley R. R., 236 U.S. 412, 430, 35 S.Ct. 328, 335, 59 L.Ed. 644 (1915), stated:

"This provision only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most, therefore, it is merely a rule of evidence. It does not abridge the right of trial by jury, or take away any of its incidents. Nor does it in any wise work a denial of due process of law. * * * Such statutes have been generally sustained, * * * as have many other state and Federal enactments establishing other rebuttable presumptions."

Moreover, it seems clear that Congress has expressed its conclusion that a Commission proceeding is sufficiently comparable to a "day in court" that a final Commission order can be used against a defendant in a subsequent proceeding. As we mentioned above, Congress has provided that a final Commission order can be the unimpeachable basis of a Justice Department suit against a defendant for violation of such order, with fines up to $5000 for each violation. 15 U.S.C. § 21(*l*) (1964). Our interpretation of section 5(a) only makes a final Commission order the impeachable basis of a suit by a private litigant.

Thus, for the reasons stated above and in accordance with the now prevailing trend of authority,[37] we con-

process once they are in office. Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

36. 25 Stat. 859 (1889), as amended, 49 U.S.C. § 16(2) (1964).

37. Y & Y Popcorn Supply Co. v. ABC Vending Corp., 263 F.Supp. 709 (E.D.Pa. 1967); Carpenter v. Central Arkansas Milk Producers Ass'n, 1966 CCH Trade Cas. ¶ 71, 817 (W.D.Ark.1966); Farmington Dowel v. Forster Mfg. Co., 299 F. Supp. 1043 (D.Me.1967); Contra: Highland Supply Corp. v. Reynolds Metals Co., 245 F.Supp. 510 (E.D.Mo.1965).

Matteoni, "An Antitrust Argument: Whether a Federal Trade Commission Order is Within the Ambit of the Clayton Act's Section 5", 40 Notre Dame Law. 158 (1964); 78 Harv.L.Rev. 469 (1964); 53 Georgetown L.J. 481 (1965); 64 Mich.L.Rev. 1156 (1966); Wilson, "Federal Trade Commission Orders and The Clayton Act § 5: A Reexamination", 12 Antitrust Bulletin 27 (Spring 1967); Shores, "Treble Damage Antitrust Suits: Admissibility of Prior Judgments Under Section 5 of the Clayton Act", 54 Iowa L.Rev. 434 (1968); but see Rockefeller, "The Supreme Court and the Private Antitrust Litigant", 7 B.C.Ind. & Comm. L.Rev. 279 (1966).

clude that the legislative concern that the defendant get a "day in court" before section 5(a) operates against him is fully satisfied by a Federal Trade Commission proceeding.[38]

Looking at the other side of the ledger concerning the fairness of our result, we note that substantial—and surely unintended—unfairness to injured plaintiffs would result from a holding *excluding* final Commission orders from section 5(a). The Supreme Court in *3M* noted the unfairness which results from any differentiation between the Justice Department and the Commission for purposes of section 5, given the arbitrary allocation of enforcement efforts between them. This unfairness is intensified by the fact that the Justice Department has generally deferred to the Commission for the enforcement of the Robinson-Patman Act. Thus, if Commission orders do not qualify under section 5(a), violators of the Robinson-Patman Act would enjoy a greater practical immunity from private litigation than violators of other antitrust laws, a distinction insufficiently supported by reason, fairness, or legislative history.

As for the contention that Forster's right to trial by jury has been violated by admission of the Commission order

as prima facie evidence, it would—if sound—as well apply to a court judgment secured by the government in a suit for an injunction. No one has seriously, to our knowledge, taken such a position. Indeed, as the Supreme Court stated in the above quoted portion of *Lehigh Valley,* giving prima facie effect in a subsequent jury trial to a prior administrative order "does not abridge the right of trial by jury, or take away any of its incidents." Moreover, the Supreme Court has not considered the use of rationally-based rebuttable presumptions in criminal trials as a denial of jury trial. *See* Leary v. United States, 395 U.S. 6, 32–36, 89 S.Ct. 1532, 23 L.Ed. 2d 57 (1969); United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); and Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943).

## EXTENT OF ADMISSIBILITY OF ORDER

◼ Having concluded that a final Commission order can be admitted as prima facie evidence pursuant to section 5(a), we are confronted with Farmington's contention that the district court admitted less of the Commission's decision than the law prescribes.[39]

---

38. Our holding is in accord with those cases holding that the determination of an issue by the Federal Trade Commission is *res judicata* of that matter insofar as other branches of the United States government is concerned. E. g., United States v. Williard Tablet Co., 141 F.2d 141, 142–143 (7th Cir. 1944); 152 A.L.R. 1194; United States v. Piuma, 40 F. Supp. 119, 122 (S.D.Cal.1941), aff'd, Piuma v. United States, 126 F.2d 601 (9th Cir. 1942), cert. denied, 317 U.S. 637, 63 S.Ct. 28, 87 L.Ed. 513 (1942); United States v. Five Cases of Capon Springs Water, 62 F.Supp. 736, 738–739 (S.D.N.Y.1945), rev'd on other grounds, 156 F.2d 493, 495 (2d Cir. 1946); United States v. Hindman, 179 F.Supp. 926, 927 (D.N.J.1960).

Necessarily implicit in these decisions is the proposition that a final Commission order is qualitatively comparable to a court judgment.

39. Forster, ill-advisedly in our view, urges that this issue was not open to Farmington, since Farmington's notice of appeal was more than 30 days from the date of final judgment.

Final judgment was entered on March 11, 1969; Forster noticed its appeal on March 17. On March 18, Farmington filed a timely motion under Rule 59(e), Fed.R.Civ.P., to amend the judgment insofar as it refused to award reasonable attorney's fees, which motion was denied on March 26. On April 25—45 days after final judgment but only 30 days after denial of the Rule 59(e) motion—Farmington noticed its appeal.

Rule 4(a), Fed.R.App.P., expressly provides that the 30-day time for appeal shall commence anew following the entry of an order concerning any timely motion under, *inter alia*, Rule 59(e). Indeed, there was no artful way for Farmington to file a general appeal before March 26, for any

The district court, after admitting the final order as it related to wooden skewers, then instructed the jury that it should give prima facie evidentiary effect to two findings by the Commission: first, that Forster had discriminated in sales of wooden skewers by charging prices to three customers which were lower than the prices charged to other customers; and second, that the effect of these price discriminations may have been substantially to lessen competition or to tend to create a monopoly in that line of commerce. Farmington insists that the law required the district court to give prima facie effect to more of the findings.[40]

The Supreme Court's decision in Emich Motors v. General Motors, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951), constitutes the accepted cornerstone of the law regarding the extent of admissibility under section 5(a). After concluding that the evidentiary use of prior judgments under section 5(a) is to be determined by reference to the general doctrine of collateral estoppel, the Court stated that a prior judgment constitutes prima facie evidence of "all matters of fact and law necessarily decided" by an earlier adjudication. *Emich Motors, supra* at 568–569, 71 S.Ct. 408, 414.[41] Subsequently, the Supreme

---

such general appeal might have placed the district court in the awkward position of having lost jurisdiction while still being asked by the same party to make a specific alteration of the judgment. March 26 was the logical time to start the 30-day period and Rule 4(a) so provides. We do not understand Rule 4(a) to attach any significance to the fact that the appeal of April 25 raised more objections to the judgment than had the Rule 59(e) motion.

40. Specifically, Farmington requested admission pursuant to section 5(a) of the following documents:
 1. Examiner's Initial Decision, dated February 2, 1962, as it relates to skewers;
 2. Opinion of the Commission, dated January 3, 1963, as it relates to skewers;
 3. Final Order, dated March 18, 1963, as it relates to skewers;
 4. Opinion on Remand, dated July 23, 1965, as it relates to skewers, and
 5. Final Order, dated July 23, 1965, as it relates to skewers.

 In addition Farmington compiled the findings made therein and presented its compilation as Plaintiff's Exhibit IB(iv), which included the following categories: formal identification of defendant (items 1 and 2); the shares of the six skewer manufacturers in the U. S. market (item 3); the early history of Farmington (items 4–6); the development of animosity between Farmington and Forster, cancellation of orders from Farmington by Forster, Farmington's efforts to seek other customers, various threats and general price cuts by Forster (items 7–17); discriminatory price cuts given to four customers by Forster (items 18–25);

causal relation between the discriminatory price cuts and Farmington's failure and lessening of competition in the skewer industry generally, tending to create a monopoly in the skewer industry, absence of justifiable reason (items 26–33); conclusions that Forster was "not merely meeting competition, but * * * beating it", that "this is not a close case" concerning good faith meeting of competition, that Forster was motivated by predatory intent (items 34–38).

41. Additional authorities suggest that the "necessarily decided" limitation is rather firmly embedded in the law of collateral estoppel. In Yates v. United States, 354 U.S. 298, 336, 77 S.Ct. 1064, 1086, 1 L.Ed.2d 1356 (1957), the Supreme Court asserted:
 " * * * the doctrine of collateral estoppel * * * makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were *essential* to the decision. * * * Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 601–602, 68 S.Ct. 715, 92 L.Ed. 898; Tait v. Western Maryland R. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405; Evergreens v. Nunan, 141 F.2d 927, 928, 152 A.L.R. 1187." (Emphasis added.)
 Years earlier, Judge Learned Hand had occasion to confront this problem:
 "A judgment * * * may be an estoppel * * * the estoppel extends only to facts decided and necessary to the decision. All this is very old law." Irving National Bank v. Law, 10 F.2d 721, 724 (2d Cir. 1926).
 *See also* Restatement, Judgments § 68(1) and comment o; 1B Moore's Federal Practice, 2d Ed., ¶ 0.441[2], p. 3777.

Court concluded in Yates v. United States, 354 U.S. 298, 338, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), that the general doctrine of collateral estoppel only operates to estop a party on ultimate facts in the subsequent proceeding.[42] Accordingly, the district court below admitted as prima facie evidence only those findings by the Federal Trade Commission which it believed "were necessary to the Commission's decision and which establish ultimate facts in issue in this action as evidenced by the present posture of the pleadings." Farmington Dowel v. Forster Mfg. Co., 299 F.Supp. 1048, 1053 (D.Me.1967).

Farmington contends, however, that the Supreme Court's decision in Hanover Shoe v. United Shoe Machinery, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)—decided after the district court's initial ruling on admissibility of the Commission findings—so changed the law under section 5(a) that the Court's ruling constitutes reversible error. We cannot agree.

The district court in the Hanover Shoe case had allowed Hanover Shoe to introduce the findings, opinion, and decree of an earlier federal court proceeding (110 F.Supp. 295 (1953)) as prima facie evidence that United Shoe's "lease only" system was an instrument of monopolization. United Shoe appealed on the ground that that earlier adjudication had not actually condemned their "lease only" practice. The Supreme Court, in up-

holding the district court's determination, stated at 485–486, 88 S.Ct. at 2227–2228 that:

"If by reference to the findings, opinion, and decree it is determined that an issue was actually litigated in an antitrust suit brought by the Government, the private plaintiff can treat the outcome of the Government's case as prima facie evidence on that issue. See Emich Motors v. General Motors, 340 U.S. 558, 566–569, 71 S.Ct. 408, 95 L.Ed. 534 (1951).

"Section 5 of the decree would have been a justifiable remedy even if the practice it banned had not been instrumental in the monopolization of the market. * * * These portions of the court's opinion are well supported by its findings of fact, which also estop United as against the Government and which therefore constitute prima facie evidence in this case."

Thus, on the surface it does appear that the well-established standard of "necessarily decided" may have been somewhat diluted by the decision in Hanover Shoe. Farmington contends that this constitutes an open sesame to admit any finding which is "relevant" to a subsequent proceeding. Several observations give us pause.

In the first place there is the reference without gloss to Emich. It strikes us that the Court would not so casually effect a major departure in collateral

42. At 338, 77 S.Ct .at 1087, the Court stated:

"The normal rule is that a prior judgment need be given no conclusive effect at all unless it establishes one of the ultimate facts in issue in the subsequent proceeding. So far as merely evidentiary or 'mediate' facts are concerned, the doctrine of collateral estoppel is inoperative. Evergreens v. Nunan, 141 F.2d 927, 152 A.L.R. 1187; Restatement, Judgments § 68, comment p."

But see Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 225–226 (9th Cir. 1964), cert. denied, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). This case is cited appropriately by Farmington for the proposition that all matters decided in a prior proceeding

which are "relevant" to a subsequent one are admissible under section 5(a). We find the case enigmatic, for its referenced authority is Emich, but its formulation of principle overlooked the "necessarily decided" limitation expressed in Emich. It may well be that the findings held to be admissible qualified under Emich. But we cannot take the brief and possibly unconsidered reference to a standard of mere relevancy in Twentieth Century Fox as definitive. See our opinion in International Shoe Machinery Corp. v. United Shoe Machinery Corp., 315 F.2d 449, 453–454, 459 (1st Cir. 1963), for a discussion of our view of how "relevancy" bears on the operation of section 5(a).

estoppel doctrine without rationale. Secondly, the argument between the majority and the dissent was directed solely to the question whether the district court had actually made a finding on "lease only", not whether such finding was necessary to its decision.

Thirdly, the Court made it clear in *Hanover Shoe* that "the Government's case involved condemnation of the lease only system as such." *Hanover Shoe, supra* at 485, 88 S.Ct. at 2227. We understand this to mean that "lease only", whether logically "necessary" to the decree or not, was a major factor, broader than all the specific parts of the lease. Its magnitude of importance assured that intense focus of counsel and court which underlies and justifies the law's willingness to be content with only one litigation of a significant issue.

Finally, the particular situation before the Court in *Hanover Shoe* seems to us to be one in which a departure from the requirement of necessity is justified and recognized as an exception to the "necessarily decided" rule. *Hanover Shoe* involved a prior adjudication in which many practices of United Shoe had been condemned as instruments of monopolization. Thus, in all probability, it was not "necessary" to the final decree that any one particular practice be condemned, for the other condemned practices would still be enough to sustain the decree. Yet if the "necessarily decided" standard were strictly applied to that adjudication, no estoppel would have arisen and the multiple offender would have avoided the prima facie effects of section 5(a).

Farmington recognizes this problem in its brief:

"For example, the Government may prove several overt acts in a conspiracy charge. If specific findings are made that such acts were committed in furtherance of the conspiracy, how is the trial judge in a subsequent private action to determine that one act was *necessary* to the decision while another was not?"

Farmington draws from the impossibility of determining which of four legs holds up a chair the conclusion that all relevant decided facts should come in. But this is too great a leap. The recognized exception to strict essentiality is more limited. As Moore states it:

"It is clear, however, that the mere existence of another possible ground for a judgment, even though it abrogates the strict necessity of an adjudication upon a material issue, does not deprive the judgment of conclusive effect upon that issue if it was in fact determined." 1B Moore's Federal Practice, 2d Ed., ¶ 0.443[5], pp. 3920–21 and cases cited in nn. 9–10.

For these reasons, we do not understand *Hanover Shoe* to have substantially altered the general rule that collateral estoppel only applies to those matters "necessarily decided" by the prior adjudication. We understand this rule to mean in common language something like this: when two adversaries concentrate in attempting to resolve an issue importantly involved in a litigation, there is no unfairness in considering that issue settled for all time between the parties and those in their shoes. But since parties can be expected to exert their full effort only on what seems essential at the time, it is unfair to close the door to issues which have not been on stage center, for there is no knowing what the white light of controversy would have revealed. *See* Riverside Press, Inc. v. NLRB, 415 F.2d 281, 284 (5th Cir. 1969).

Accepting this standard, we ask what findings were necessarily made by the Commission. It seems clear to us that the Commission was required, if a cease and desist order were to issue under section 2(a) of the Clayton Act, to find that Forster engaged in discriminatory price cuts which tended to lessen competition or to create a monopoly in

the skewer industry.[43] These were the issues "necessarily decided". These were the foci of controversy. And they were admitted. The bulk of the other items, while putting flesh on the bones and color on the flesh, could not be said to be essential to the Commission's decision.[44] Nor do any of them come within the exception to strict necessity which we have noted in our discussion of *Hanover Shoe*.

█ However, we do believe that the district court erred with regard to one finding. Forster raised the section 2(b) "meeting competition" defense, which thus required the Commission to find that Forster's price discriminations were not "made in good faith to meet an equally low price of a competitor", 15 U.S.C. § 13(b) (1964), as that phrase was interpreted in Federal Trade Commission v. A. E. Staley Mfg. Co., 324 U.S. 746, 759–760, 65 S.Ct. 971, 89 L.Ed. 1338 (1945). Since the defense was raised, the matter was "necessarily decided" and thus the finding should have been admitted as prima facie evidence below.

Yet we do not believe that its exclusion was reversible error. Farmington was able to get in other evidence which tended to show a lack of good faith in Forster's actions. Moreover, the jury found for Farmington on all questions of liability which were submitted to it. We recognize, of course, that a jury may find itself penalizing a very bad man more than just a bad one. But though this is within a jury's power, it is not within a plaintiff's rights. We can only conclude that no prejudice arose from this one improper exclusion which necessitates a new trial.

Finally, even if we have misconceived the proper standard for admissibility, we fail to see how the district court's exclusion of the Commission's opinions or the many evidentiary findings so prejudiced Farmington that it is entitled to a new trial. As we said, the jury found in favor of Farmington and against Forster on every question of Forster's liability which was submitted to it. However, Farmington contends that but for the court's exclusions, they would have been able to prove monopolization by Forster as well as the attempted monopolization which the jury did find. Even assuming that this highly speculative contention is true, we fail to see how such a finding would have increased the jury's award of damages to Farmington. The jury found that as a result of Forster's actions Farmington had been deprived of $29,100 in profits up to February 28, 1958, the day which Farmington went out of business. Moreover, the jury found that Farmington's "going concern" value on that day was $80,000. It was that total of $109,100 which was trebled by the court in awarding damages to Farmington. We fail to see how a jury finding of monopolization by Forster would have increased the damage inflicted on Farmington. Were Caesar to be run through thrice, he would not be thrice dead.

## EXCLUSION OF PROFFERED EVIDENCE

Farmington also objects to various rulings by the district court excluding evidence of damages proffered by Farmington. While Farmington is less than clear about what rulings were erroneous and why, we understand it to be raising essentially four objections.

---

43. Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), provides in relevant part: "It shall be unlawful for any person engaged in commerce, * * * to discriminate in price between different purchasers of commodities * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce * * *."

44. Of course nothing we say herein concerning collateral estoppel is intended to detract from the general rule, which has our unqualified support, that the Commission should set forth its findings of fact, reasoning and conclusions of law as fully and carefully as possible.

First, Farmington insists that it should have been allowed by the district court to prove lost profits from 1956 to November 1968, the date of trial, plus its "going concern" value in November 1968.[45] The district court—correctly, we believe—confined Farmington to lost profits from 1956 to February 28, 1958, the date when Farmington went out of business, plus the "going concern" value of Farmington on that date. These items were subject to a rationally-based quantification, although the latter determination obviously involved an element of speculation. Moreover, this method seems an adequate basis for giving full relief to the injured plaintiff Farmington: its lost profits to the time of cessation of business and the value which the business would have had at that time but for Forster's illegal actions.

On the other hand, the method urged by Farmington would have required an estimate of profits for a period of some ten years during which the company neither existed nor made profits, plus an estimate of the "going concern" value in 1968 of a company which had ceased being a going concern over ten years before, which estimate would have involved a further estimate of profits for a more remote future period. While we recognize, as did the district court, that the private antitrust litigant is not required to prove the amount of his damages with any certainty—e. g., Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 561–562, 51 S.Ct. 248, 75 L.Ed. 544 (1931)—the method urged by Farmington, at least as applied to this case, relies too heavily on speculation and conjecture, particularly concerning the determination of "going concern" value so long after the company ceased to be a going concern. We think it noteworthy that Farmington has not directed our attention to a single case in which its method was used.[46] Nor has Farm-

45. We understand Forster to misunderstand Farmington's argument on this point. Forster argues that Farmington cannot get lost profits from 1956 to November *1968* in addition to its "going concern" value as of February *1958*. We of course agree. *See* discussion in text, *infra*. Yet we understand Farmington, at least initially, to be seeking its "going concern" value as of November 1968, rather than as of February 1958 as Forster's argument suggests.

46. Farmington seems to draw the greatest comfort from Twentieth Century-Fox Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir. 1952), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952). That case did take account of lost profits for a period after the time that the plaintiff had been driven out of business. However, critical distinctions exist. First, unlike our case, the business in that case was continued in essentially the same form by one of the defendants, thereby producing *actual* profits over the period in question which could be estimated with some degree of certainty. Secondly, that court did not make an award for future lost profits *in addition to* an award for "going concern" value, which is what Farmington seeks here.

Finally, to the extent that the court may have awarded what could be called the "going concern" value of the plaintiff there, it was figured as of the day that the plaintiff had been forced out of business.

Farmington relies also on Atlas Building Products Co. v. Diamond Black & Gravel Co., 269 F.2d 950 (10th Cir. 1959), cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960), which decision upheld an award of lost profits and diminished asset value. Yet the method used by the district court in our case awards both aspects of damages. The basic dispute between the district court and Farmington seems to us to concern the date for which "going concern" value should be determined. The *Atlas Building* case gives no indication of the date for which "diminished asset" value was determined in that case. Since that business continued up to the time of trial, there is little speculation involved in estimating "diminished asset" value as of the time of trial, assuming arguendo that the court did so. Yet in our case, when the business ends on a given date, it seems far too speculative to give "going concern" value for a date ten years after it had ceased to be a going concern.

82

ington offered us a single case in which a company's "going concern" value was determined for a date well after the day that that company had ceased to be a going concern. Accordingly, we conclude that the district court was correct in allowing Farmington to prove its "going concern" value as of February 28, 1958, the last day it was a going concern, rather than as of November 1968.[47]

Given this holding by us, we do not understand Farmington to contend that it should also be awarded lost profits for the period after February 1958 up to November 1968. Moreover, it seems crystal clear to us that lost profits for that period could not be properly awarded in addition to "going concern" value on February 28, 1958. To do so would result in a clear duplication: Farmington would get its present value as a going concern plus its future profits, but the latter figure would be a major element in determining the former figure. The Clayton Act gives treble damages, but it does not contemplate that damages will be sextupled.

■ As a second objection, Farmington contends that one Professor Chances should have been allowed to testify regarding some or all of his damage theories. The district court, after demonstrating an awareness of

the standard of certainty of damages set forth in Bigelow, supra, and Story Parchment, supra, concluded that none of Professor Chances' damage theories would provide the jury with a reasonable basis upon which it could determine Farmington's "going concern" value on February 28, 1958, without resort to surmise, conjecture, and guesswork. We believe that the district court was well within its discretion in so holding.

Two of the methods proposed by Professor Chances relied on Forster's sales record from 1951 to 1968 to indicate Farmington's sales for that period, but the district court concluded that the two businesses were not sufficiently comparable to justify such reliance. We believe the important differences pointed up by the district court are sufficient to justify that exercise of discretion.[48]

■ A third method proposed by Professor Chances relied on the average annual increase in the gross national product for the United States for the period 1951–1968; a fourth method relied on the average annual increase in sales for all manufacturing companies for the same area and years. Yet Farmington offered no evidence that its wooden skewer business was in any way comparable to either determination.

47. E. Timberlake, "The Legal Injury Requirements and Proof of Damages in Treble Damage Actions Under the Antitrust Laws", 30 Geo.Wash.L.Rev. 231, 280 (1961). We note that the district court stated its reason in terms of "duplication". On analysis, we see no duplication in estimating ten years' profits, followed by an estimate of the going concern value at the end of those ten years—which involves putative profits for subsequent years. But, for reasons stated, we agree with the district court's ruling.

48. The district court noted at least four reasons why the two businesses were not sufficiently comparable. First, while Farmington's production was limited almost entirely to wooden skewers, Forster manufactured some 24 woodenware products in addition to skewers, which comprised a relatively small proportion of its total business. Second, Farmington had

no sales or distribution organization which was remotely comparable to the extensive sales and distribution organization which Forster maintained throughout the United States. Third, Farmington was minimally capitalized, while Forster was adequately capitalized. Finally, Forster would be an inappropriate yardstick of comparison after 1956 simply because Forster's sales and profits after that time reflected the illegal monopolization and discriminatory sales which Farmington had to show in order to be entitled to any damages. Clearly Farmington was no more entitled to the monopoly profit than Forster was.

The only countervailing evidence offered by Farmington was Professor Chances' own testimony that Farmington and Forster were selling a similarly-made product to the same general group of customers.

Thus, there can be no abuse of discretion in excluding such figures.

A fifth and final approach of Professor Chances was to attempt to arrive at a going concern value solely by capitalizing Farmington's expected profits. He chose as a period for projection the six years following 1958 "because generally speaking it is five to seven years ahead that projections are made and this was a mean." He projected Farmington's sales from 1953–1956 data, assuming a decreased rate of growth for a period of years, finally levelling off in 1961. He arrived at profit projections after 1956 by assuming, on the basis of the 1953–1956 experience of Farmington, a steady increment of 35 dollars for each hundred dollars of increased sales. No consideration was given the future state of the skewer market, or to future costs of labor, executive salaries, supplies or equipment. The district court based its exclusion of this testimony of Professor Chances on the unreliability of the arbitrary period selected for capitalizing future profits and on the method of deriving figures for expected sales and profits. We hold that this ruling was within the discretion of the court. We would add that, after reviewing 281 pages of testimony on this fifth approach at valuation, there was adequate reason to fear that the jury would be either confused or mesmerized by the profusion of computations. *See* Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912–913 (2d Cir. 1962), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

Farmington's third objection is directed at the court's rulings which excluded the opinion testimony of Richard Norton, a part-owner of Farmington and its manager from 1954 to 1958, concerning his estimate of lost profits and going concern value as of February 28, 1958. The basis of the court's exclusion seems to have been that Farmington had not qualified Norton as one competent to offer an opinion on these matters. We cannot say that a business manager is sufficiently qualified *as a matter of law* to offer his opinion on such matters, and we have found no case which suggests otherwise.[49] When Norton's competence was challenged, Farmington merely noted an objection and moved on. Subsequently, an offer of proof was made which did not go to qualifying Norton to give his opinion but was simply that Norton would have given profit estimates for the two years prior to closing down, estimates for the seven following years, and a going concern value which would be seven times the average projected profits. This testimony had all the vulnerabilities of Professor Chances' testimony, without the latter's qualifications or a proper application of the discounting principle.[50]

Finally, concerning Farmington's ambiguous allegation that the district court "imposed on plaintiff an impossible and inapplicable burden of damage proof", we can only respond with an observation that the district court seemed well aware of the standard of certainty enunciated in *Bigelow, supra,* and *Story Parchment, supra.* We believe the court applied the appropriate standard well within the bounds of its discretion. To the extent it was an impossible burden, which we doubt in light of the jury's award, it was so only because Farmington chose to rely

---

49. We recognize that a witness somewhat similar to Richard Norton was allowed to testify in both *Story Parchment, supra* at 567, 51 S.Ct. 248, 75 L.Ed. 544, and in William H. Rankin v. Associated Bill Posters of United States and Canada, 42 F.2d 152, 155 (2d Cir. 1930). However, we find nothing in either case to suggest that such a witness *must* be allowed to testify.

50. Arriving at value through capitalization of projected earnings involves evaluating "the present worth of each part of the stream of future receipts" and adding "these separate present discounted values." Samuelson, Economics: An Introductory Analysis, 6th ed., p. 587. Capitalized market value is *not* arrived at simply by multiplying average earnings and an appropriate number of years, the method apparently used by Norton.

almost entirely on one expert witness and one lay witness for its proof of damages. Any inadequacy which may have resulted should be attributed to Farmington's own presentation of its case rather than to the law or the court's application of it here.

### FARMINGTON'S "GOING CONCERN" VALUE

As we have mentioned above, the jury awarded Farmington $29,100 for its lost profits between May 1956 and February 1958, and $80,000 as its "going concern" value on February 28, 1958. Neither party has appealed the $29,100 award. However, Forster contends that there is insufficient evidence to support the jury's award of $80,000.

The Supreme Court has made it clear that

" * * * there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount." *Story Parchment, supra* at 562, 51 S.Ct. at 250.

We understand Forster to concede that, given our holding with regard to the admission of Federal Trade Commission findings, Farmington has carried its burden with regard to the fact of damage. In other words, Forster is not here appealing the jury's finding that Forster drove Farmington out of business. Instead, having conceded that, it argues that Farmington has not carried the lesser burden of giving the jury evidence on which it can fix the amount of damages.

Concerning this burden, the Supreme Court in *Story Parchment, supra* at 563, 51 S.Ct. at 250, explained that

"In such case [as ours], while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."

Accordingly, the question here presented is whether there was so little evidence of Farmington's "going concern" value on February 28, 1958 that the jury's estimate of $80,000 must have been based on speculation or guesswork rather than a just and reasonable inference from the evidence.

The evidence on damages that was allowed to sift through to the jury was, as revealed by our discussion above, a remnant of that offered. Forster summarizes this evidence as only Farmington's profit and loss statements for the years 1953 to 1956, showing average yearly net profits of less than $3,000; earnings for the eight month period ending on May 31, 1956 of $13,103, which Farmington's expert witness extrapolated to a yearly total of $14,500;[51] and the fact that Farmington purchased its business in October 1952, for $80,000. Forster insists that expert testimony should have been offered of the "but for" value of Farmington in February 1958, when it went out of business; of a capitalization factor appropriate in the skewer industry; and of the "but for" profits in 1957 and 1958. While we also would have liked to have such evidence in the record, we are mindful of the problems which faced Farmington in getting wit-

51. This figure is claimed by Forster to be impeached by the testimony of its expert that the $13,103 figure was inflated by at least $10,000, apparently by reason of an understated beginning inventory. Yet this writedown was not conclusively established, and the jury apparently accepted the $14,500 figure for the purpose of arriving at its award of $29,100 for lost profits between May 1956 and February 1958, which award was not appealed.

Even if there had been such an alleged writedown, the effect would have been to make 1955 more profitable and the first 8 months of 1956 less so—not, on balance, a critically different posture for Farmington. While Forster could have better argued a downward dip, Farmington could have pointed to a more impressive showing prior to the intense period of pressure from Forster.

nesses qualified to give this kind of testimony. The skewer industry in the 1950's had only six participants, two of whom were the parties, the remaining four being considerably smaller.[52] Such a predicament, however, cannot turn an insufficiency into a sufficiency.

In fact, however, the evidence before the jury was broader than that recited by Forster. The evidence marshalled, as the jury had a right to view it, showed a company which had entered the skewer market in 1947, subsequently becoming the second largest U.S. supplier with sales in every state and in England, and which had thus been purchased in 1952 for almost twice what it had cost the seller ten years earlier. Farmington had added approximately $17,000 in improvements and equipment since 1952. When Farmington purchased the business, Forster accounted for about 70 per cent of its sales; four years later Farmington had so diversified that other customers accounted for 70 per cent. In absolute terms, annual sales to Forster had dropped $86,000 between fiscal year 1953 and 1956, while annual sales to others had risen by $93,000. Thus, by mid-1956, Farmington was selling more skewers to more purchasers than it had in 1952.

Although Farmington's profits in 1955 were low (*but see* n. 51), Farmington was confronted with considerable pressure from Forster. In 1954 Forster insisted upon reducing the prices it paid for several kinds of Farmington's skewers, with the avowed purpose, not then carried out, of reducing its prices to meet competition. In 1955 Forster precipitously cancelled projected orders for 3,000 boxes of skewers, at a time when Farmington's inventory was high.[53] Even so, Farmington was able to find other customers and come within $16,000 of its previous record sales year. This conduct by Forster is not part of this case in the sense of being actionable; but the jury would have been justified in concluding that there were abnormal aggravations which concealed Farmington's basic potential.

Finally, there was the testimony of Professor Chances that Farmington's 1956 profits "but for" Forster's price discrimination would have been $14,500, its highest ever. Based on this and other evidence, the jury found that Farmington would have made $29,100 in profits over less than two years between May 1956 and February 1958 but for Forster's actions, which jury finding has not been appealed. That finding clearly indicates the jury's belief that the improving business status of Farmington would have continued but for Forster's actions.

We conclude that these facts provided the jury with a rational basis for estimating Farmington's "going concern" value as of February 28, 1958 at such a figure as $80,000. While the date of purchase was some five years earlier, Farmington's ability to diversify and to show some profits under difficult conditions, its position in the skewer industry, and its prospects for the future— as the jury could have seen them—gave a basis for concluding that the business was worth at least as much in 1958 as in 1952. The defendant caught red-handed must bear the risk in such circumstances, particularly when the jury's verdict is reasonable, if not conservative.

Accordingly, we have no occasion to confront Forster's contention that the "raw data" of profit and loss statements standing alone is, as a matter of law, an

inadequate basis for determining going

52. It seems to have been assumed by all parties that Forster was the most similar to Farmington although not comparable enough to be used as a yardstick. *See* n. 48, *supra*.

53. The value of orders cancelled ($28,950) amounted to 20% of the projected yearly purchases by Forster, and 12% (or one and a half months) of Farmington's total sales. While the case contents and unit price to arrive at these figures were in evidence, we do not suppose that the jury made this precise a calculation. But it would have been justified in concluding that the cancellation posed a substantial problem.

concern value. Regarding that contention, however, Forster would apparently have us hold that "raw data" is never enough for a jury to estimate "going concern" value, but that "raw data" plus one witness might be. Yet the one witness in the part of the *Story Parchment* case concerned with market value of a defunct business was described by the Supreme Court as "the treasurer [of the business] * * * an interested witness * * * not an expert" *Story Parchment, supra* at 567, 51 S.Ct. at 252: Nevertheless, the Court said it was for the jury to give the treasurer's testimony its appropriate weight—presumably it could have given such interested, inexpert testimony no weight at all—and thus the Court upheld the jury's award. If such witnesses can be disregarded, surely they are not indispensable to the validity of the jury's determination.

## "REASONABLE ATTORNEY'S FEES"

We arrive at the final objection raised on appeal, this time by Farmington. The district court adopted the jury's finding of $109,100 in damages, trebled it, and awarded $327,300 to Farmington. It then heard from the parties on what they considered a "reasonable attorney's fee" for Farmington's attorneys to be awarded pursuant to section 4 of the Clayton Act.[54]

Farmington asked for $109,100; Forster contended that $50,000 was the proper amount. At this point the district court learned, on Forster's request, of the fee arrangement between Farmington and its attorneys. Briefly stated, the contract provided that the attorneys would get one third of the trebled damages, plus all of the amount awarded as a "reasonable attorney's fee" pursuant to section 4.[55]

The district court concluded that $85,000 would be a reasonable attorney's fee for Farmington's counsel in this case. *Farmington Dowel Products Co. v. Forster Mfg. Co.,* 297 F.Supp. 924, 925–928 (D.Me.1969). However, the court then noted that if it were to award this $85,000 to Farmington's counsel, the fee arrangement would yield $194,100 for counsel and leave $218,200 of the recovery to the client Farmington. When confronted with these facts, the district court ruled that any award of a "reasonable attorney's fee" under section 4 of the Clayton Act would be both excessive and contrary to the language and purposes of that section, even though the court recognized that its ruling would give Forster an undeserved "windfall" of $85,000. *Farmington Dowel Products, supra* at 928–930. Accordingly the court awarded no fees pursuant to section 4.[56] Predictably, Farmington appeals.[57]

54. Section 4 of the Clayton Act, 15 U.S.C. § 15 (1964), provides:
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

55. It should be noted that Farmington had three different law firms working on this case at various times. The fee arrangement in question provides that the chief counsel will get two thirds of the fee and that the two local counsel will share one third.

56. A second aspect of Farmington's appeal of the court's ruling under section 4 of the Clayton Act concerned the court's refusal to award Farmington some $6,920.77 as its "cost of suit". Having care-

fully read the district court's treatment of this issue at 930 of the above-noted opinion and the cases cited therein, we are satisfied that Farmington's claim was properly denied.

57. At the outset, Forster contends that Farmington is without "standing" on this issue and is not "the real party in interest" since, under Farmington's fee arrangement, any recovery would go to Farmington's attorneys. This argument is without merit. As we note below, the statutory provision authorizing the recovery of counsel fees was intended to benefit antitrust plaintiffs by enabling them to retain the bulk of their trebled damages. It is clearly the plaintiff's statutory right; it was not intended to confer a statutory right on plaintiff's counsel and no one to our knowledge has ever seriously suggested that attorneys have standing under section 4. Since the pro-

The court in effect made two decisions. Acting pursuant to section 4, it determined that $85,000 was a "reasonable attorney's fee", to be added to the damages to be paid by defendant. We deem that determination well within the discretion of the court—which lived through this long and complex litigation—for the reasons expressed in its thoughtful analysis of the facts in this case and the law in this area. *Farmington Dowel Products, supra* at 925–928, and Appendices I & II.

Second, acting with knowledge of the private fee arrangement and apparently under its generic power to confine the cost of legal services to a reasonable amount, it ruled that any amount in excess of $109,100 would be excessive.[58] This second determination gives rise to the question of the court's power to concern itself with counsel fees actually to be received and of the standards governing the exercise of such power.

We think that Farmington would have to concede that the courts generally are not without power to modify excessive fee arrangements.[59] There is no evidence that section 4 was intended to inhibit this power. The fact that section 4 is concerned with awarding a fee which is reasonable for defendant to pay plaintiff does not preclude the court from concerning itself with what is excessive for plaintiff to pay his attorney. Farmington would have us hold that the court had no power to modify an excessive fee in the very circumstance where a court's award under section 4 might render an otherwise reasonable fee excessive. It seems to us that in such a case a court has a particular interest in assuring itself that it is not an unwitting accessory to an excessive fee. Moreover, it seems clear that the court's power to prevent excessive fees must be operative regardless of the arrangement by which the fee is obtained. We therefore conclude that the district court acted within its power in attempting to satisfy itself that the plaintiff's counsel would not obtain an excessive fee. We are not saying that a court should inquire *sua sponte* into actual counsel fees in every

---

vision conferred a right on plaintiffs, they must have standing to assert it. The fact that Farmington may be contractually obligated with regard to the recovery does not affect its statutory right or its standing to assert it.

Invoking the "real party in interest" rule adds nothing to Forster's argument, since the real party in interest need not be the party beneficially interested in a particular case, but only the party who under the substantive law has the right sought to be enforced. 3A Moore's Federal Practice, ¶ 17.07.

58. The court, not desiring to interfere with that part of the fee agreement calling for one third of the treble damages, was willing to tolerate a margin of difference between its section 4 decision and the amount actually to be paid counsel. It noted that one third of treble damages was "already nearly 30% more than it has concluded is reasonable." 297 F.Supp. at 929. It then looked at the total amount which the fee agreement would produce, and noted that this would be twice what it found reasonable, 175% of single damages, 58% of trebled damages, and would result in hourly rates of compensation for senior and junior partners and associates beyond those realized from the section 4 fee allowances in the cases listed in Appendices of its opinion. As a final reason, the court noted that counsel for plaintiff had sought only $109,100 as the amount of the "attorney's fee" award under section 4.

59. Canons of Professional Ethics, Canon 13:

"A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, *but should always be subject to the supervision of a court*, as to its reasonableness." [Emphasis added.] *See also* Canon 12.

E. g., Fitzgerald v. Freeman, 409 F.2d 427 (7th Cir. 1969), cert. denied, 396 U.S. 875, 90 S.Ct. 151, 24 L.Ed.2d 134 (1969); Gair v. Peck, 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43, 77 A.L.R.2d 390 (1959), cert. denied, 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960); Taylor v. Bemis, 110 U.S. 42, 45–46, 3 S.Ct. 441, 28 L.Ed. 64 (1884); McCreary v. Joel, 186 So.2d 4, 6 (Fla.1966); see F. Mac-Kinnon, Contingent Fees for Legal Services, p. 66 (1964).

case which comes before it, but only that a court may in its discretion inquire into such issue, particularly when it is brought to the court's attention as here.[60]

■ In arriving at its conclusion that it would make no award pursuant to section 4, the district court relied in part on its interpretation of the language and purpose of section 4. We understand the court to be saying, at 929, that *any* fee arrangement between plaintiff and his counsel by which the "reasonable attorney's fee" awarded by the court goes directly to counsel is contrary to the language and purposes of section 4. We disagree.

Section 4 provides that "[a]ny person who shall be injured * * * may sue * * * and shall recover threefold the damages by him sustained and * * * a reasonable attorney's fee." The district court urges that a "fees awarded" arrangement—i. e., an arrangement whereby counsel is paid whatever the court awards as "reasonable attorney's fee"— is contrary to the language of section 4 because the "statutory language makes clear the intent of Congress that the attorney's fee is to be part of the recovery by the plaintiff" and that to award reasonable attorney fees under such arrangement "would not reimburse plaintiff in any sense, since it would accrue entirely to counsel." *Farmington Dowel Products, supra* at 929.

That argument proves far too much. It would say that treble damages could not be properly awarded if counsel has a contingent fee arrangement—say, one third—because one third of such damages "would not reimburse plaintiff in any sense, since it would accrue entirely to counsel." Carried one step further, it would say that any part of the award under section 4 will not be awarded if the plaintiff is bound to pay his attorney out of it. We cannot accept that conclusion, which would leave private antitrust enforcement to the independently wealthy. It seems clear to us that in the "fees awarded" arrangement, the contingent fee arrangement, and any other fee arrangement the court's award goes first to the plaintiff as part of his recovery in accordance with the language of section 4. If he chooses to pass that money on to his attorneys, that is his business. Thus, we do not understand the language of section 4 to preclude a "fees awarded" arrangement.

Moreover, the apparent purpose behind this part of section 4 was to award the successful plaintiff a reasonable attorney's fee so that his treble damage recovery would not be unduly diminished by the payment to his attorneys. The surest way to obtain this result is by a "fees awarded" arrangement, for by such an arrangement, the counsel gets a reasonable fee and the client gets the full

60. We can think of at least three reasons why a court might be more inclined to inquire into successful plaintiff's actual counsel fees in an antitrust case. Clients may feel some distrust or disrespect for the legal profession when they are called on to honor fee arrangements which yield fees out of proportion to what the court declared to be a reasonable fee for purposes of section 4. Moreover, since the court is already immersed in the counsel fee inquiry under section 4, it is not a great step further to measure the actual counsel fee against the Canons of Ethics. Finally, to the extent that section 4 was intended to prevent a substantial diminution of the plaintiff's treble damage recovery, that purpose is frustrated when the attorney is allowed, without justification, to siphon off a substantial part of that award in addition to other compensation.

On the other hand, in addition to all of the considerations which invariably tend to restrain a *sua sponte* intervention by the court, it seems unfortunate to single out the antitrust bar for such scrutiny. We have no reason to believe that any abuses exist in this area which would justify its being treated differently from any other field of litigation. Moreover, we are aware that an actual counsel fee inquiry in every antitrust case might tend to impair the ability of private litigants to acquire effective counsel to assist them in their efforts as private attorneys general. A balancing of these considerations can be struck only by the district courts acting in their sound discretion.

trebled damages.[61] So we are not troubled by the fact that counsel might have a "fees awarded" arrangement, nor even by the fact that counsel in this case had an arrangement that embraced both a "contingent fee" aspect and a "fees awarded" aspect. Neither the language nor the purpose of section 4 precludes such an arrangement.

The court also concluded that the fee arrangement in this case yielded an excessive fee. While we agree that this is a proper inquiry, see supra, our problem with the court's decision stems from the weight given by the court, as a basis for comparison, to the "reasonable" fee award it had made under section 4, to such awards in other cases, and to counsel's request for an award in this case. (See n. 58 supra) We are also concerned that it does not appear—although this may only be a problem of articulation— that the court gave sufficient consideration to other factors bearing on a decision as to the maximum ethically permissible fee.

We would agree that those factors listed in the court's opinion, at 926, are appropriate ones for a determination of reasonableness pursuant to section 4, although these are not necessarily the only appropriate factors. Moreover, the factors mentioned in Canon 12—and listed in the court's footnote 1—are among the appropriate factors for a determination

of reasonableness for purposes of the Canons of Ethics. While the factors overlap to a considerable extent, we believe there are some important differences between a determination of reasonableness for purposes of section 4 as opposed to the Canons of Ethics which are not clearly reflected in the district court's opinion.

First, section 4 contemplates an estimate of reasonableness from the perspective of one looking back over the litigation. This seems implicit in most if not all of the factors noted in the district court's opinion and the cases cited therein. However, for purposes of the Canons, we believe that the fee arrangement should be viewed to some extent according to the circumstances in which it was made. For example, a defunct company, such as was Farmington, might reasonably expect to agree to pay counsel a larger share of any recovery than an ongoing and liquid enterprise. We do not say that an arrangement reasonable when made is thereby insulated from all attack even though it yields a fee out of proportion to the extent or the benefit of services rendered. We simply say that "reasonableness when made" is one factor, which should be taken into account for purposes of the Canons, even though it would be totally irrelevant to the determination under section 4.

---

61. While this may have been the neat division contemplated by section 4, we do not suggest that section 4 corseted either courts or attorneys and clients too tightly. Section 4 obliged a court to fix an amount which was reasonable in light of the terrain it had crossed with counsel, which amount was to be added to the damages the defendant should pay both as a penalty and as a method of enabling the plaintiff to emerge with something approaching three times his proven loss. On the other hand, clients and lawyers were left to make their own arrangements. We recognize that in some difficult cases a fee arrangement entirely consistent with the Canons of Ethics could result in a substantial diminution of the plaintiff's treble damage recovery without offending section 4. Accordingly, the actual fee arrangement between lawyer and client should have no bearing on what the court awards under section 4. Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 570 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952); Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 166 F.Supp. 163, 169 (E.D.Pa.1958), aff'd, 273 F.2d 218 (3d Cir. 1959), rev'd on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Webster Motor Car Co. v. Packard Motor Car.Co., 166 F.Supp. 865, 866 (D.D.C.1955), cross appeal dismissed as moot, 243 F.2d 418 (D.C.Cir.1957), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

■ Secondly, we believe that the fact that a fee arrangement is contingent upon success is a factor for the determination under the Canons, Canon 12(5), although it would not be for section 4. Obviously, the fact that the attorney is willing to take an all-or-nothing arrangement might justify a fee which is higher than the going hourly rate in the community. Again, this is just one factor but it is a factor which is irrelevant to the section 4 determination.

■ Finally, there is a difference in over all complexity between the court's role in awarding a fee under section 4 and in exercising its supervisory power over the bar. The first is commonly exercised; the second is reserved for exceptional circumstances. The first requires the court to arrive at a figure it considers reasonable; the second requires it to arrive at a figure which it considers the outer limit of reasonableness. The first determination is made without reference to any prior agreement between the parties; the second must take account of the fact that an agreement, if freely made, is not lightly set aside.[62] A section 4 award has only economic impact; a supervisory decision is an ethical judgment. For all these reasons, particularly when the two kinds of decisions arise in the same case, the setting of the maximum fee which can ethically be accepted requires its own deliberate articulation of rationale.

■ In short, what troubles us is the fact that the district court seemed to rely too heavily on what was reasonable for section 4 in making its determination of what was excessive for purposes of the Canons. The amounts reflected in Appendices I & II relate exclusively to the question of reasonableness for section 4; in none of those cases does it appear what plaintiff's counsel actually received and in none of those cases was that even in issue. Moreover, the fact that counsel were going to receive thirty per cent more than what was deemed reasonable for section 4 is not dispositive but only one relevant factor. Finally, the fact that Farmington asked for $109,100 as a "reasonable attorney's fee" under section 4 cannot properly be used against it. It did not believe the section 4 determination of reasonableness to bear directly on the propriety of the fee arrangement.

It may well be that, viewed in the light of the factors indicated by the Canons and our foregoing discussion, any thing more than $109,100 should be considered excessive. We simply are not certain from the court's opinion that the court appreciated the differences between section 4 and the Canons which we have discussed above. Recognizing this to be a delicate area, we feel compelled to remand this issue to the district court for a determination consistent with this opinion. We do not mean to intimate that any further evidence or argument is necessary; it may well be that the court is sufficiently informed of all pertinent considerations.

■ However, regardless of how the district court resolves the remanded issue, we believe that the court should award Farmington $327,300 as trebled damages and the $85,000 found to be a "reasonable attorney's fee" under section 4 in this case. We believe that section 4 not only contemplates recovery of a reasonable attorney's fee by a successful plaintiff but also payment of that fee by a losing defendant as a part of his penalty for having violated the antitrust laws. We cannot believe that the imposition of this penalty was meant to turn in any way on the nature or amount of the plaintiff's fee arrangement, a fortuity wholly unrelated to defendant's illegal conduct.

62. That a client, as here, remains willing to abide by his fee contract is relevant but not controlling, for the object of the court's concern is not only a particular party but the conformance of the legal profession to its own high standards of fairness.

██ If the district court decides on remand that the $194,000 fee resulting from the arrangement in this case is excessive, the proper resolution would be simply to indicate the maximum fee which Farmington's counsel can accept consistent with the Canons of Ethics. By awarding trebled damages and a "reasonable attorney's fee" to Farmington and making a finding of the maximum reasonable fee which can properly be accepted, we believe both the demands of section 4 and the Canons of Ethics will be satisfied.

The case is remanded to the District Court with instructions to modify its prior order to include an award of $85,000 "reasonable attorney's fee" to plaintiff, and to resolve the issue of the maximum ethically allowable fee in a manner consistent with our opinion.

Supplemental Order

## ON MOTION UNDER SECTION 4 OF THE CLAYTON ACT

COFFIN, Circuit Judge.

Plaintiff Farmington Dowel seeks by this motion some $17,000 as its costs of appeal pursuant to section 4 of the Clayton Act, $11,269 of which is claimed to be reasonable attorney's fees for 337 hours worked at $33.44 per hour.[1] We have already disposed of the "cost of suit" contention by our prior order that "no costs" are to be awarded for these cross appeals. However, we did not intend by that order to preclude a motion for plaintiff's reasonable attorney's fee under section 4 arising from these cross appeals.

██ It is well established that an additional section 4 attorney's fee award can be made to the plaintiff who sustains his district court judgment on appeal.[2] However, none of those cases dealt with the complication which confronts us here. In our case, the plaintiff—in addition to successfully resisting defendant's appeal—presented three claims by way of a cross appeal, only one of which was successful. As a result, defendant urges that, at most, plaintiff can recover only for work done on claims which proved successful (in this defendant properly includes plaintiff's successful efforts to protect its district court judgment from defendant's attack on appeal), and, more properly in defendant's view, that plaintiff should be awarded no attorney's fee for this appeal.

 We are reluctant to declare a rule for the section 4 "reasonable attor-

---

1. The claim for 337 hours worked—64 on post-trial motions, 273 on appeal—is not contested. The hourly rate was derived by dividing the total hours worked before and during the trial into the $85,000 found by the district court to be a "reasonable attorney's fee" for those efforts, which finding was affirmed on appeal.

2. American Can Co. v. Ladoga Canning Co., 44 F.2d 763, 772 (7th Cir. 1930) ($3500 awarded), cert. denied, 282 U.S. 889, 51 S.Ct. 183, 75 L.Ed. 792 (1931); American Can Co. v. Bruce's Juices, 190 F.2d 73, 74 (5th Cir. 1951) ($5000), petition for cert. dismissed, 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951); American Crystal Sugar Co. v. Mandeville Island Farms, 195 F.2d 622, 626 (9th Cir. 1952) ($4000), cert. denied, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952); North Texas Producers Ass'n v. Young, 308 F.2d 235, 246 (5th Cir. 1962) ($5000), cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963); Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 222 (9th Cir. 1964) ($5000), cert. denied, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964); North Texas Producers Ass'n v. Metzger Dairies, Inc., 348 F.2d 189, 197 (5th Cir. 1965) ($10,000), cert. denied, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966); Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc., 356 F.2d 371, 381 (9th Cir. 1966) ($0), cert. denied, 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966); Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 692 (8th Cir. 1966) ($4000); Armco Steel Corp. v. State of North Dakota, 376 F.2d 206, 212 (8th Cir. 1967) ($5000).

ney's fee" award on appeal which would require a fragmentation of every appeal into the parts won and lost by plaintiff. Prudent counsel may justifiably offer a number of arguments on appeal, since what might appear dispositive to a court might well differ from counsel's judgment. It therefore would be unfair and contrary to the spirit of the statute to limit the award directly to the time and effort expended on the arguments where plaintiff has been successful. On the other hand, in assessing the value of services for the purpose of making our section 4 award, we think we are entitled to take into account the fact that a substantial part of plaintiff's brief on appeal—and even more of its appendix—was devoted not to defending the judgment of the district court but to making an unsuccessful effort to secure reversal, a new trial, and thus the opportunity to obtain a larger verdict. *See* Union Leader Corp. v. Newspapers of New England, Inc., 218 F.Supp. 490, 492 (D.Mass.1963), rev'd on other grounds, Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798 (1st Cir. 1964); Osborn v. Sinclair Refining Co., 207 F.Supp. 856, 864 (D.Md. 1962), rev'd on other grounds, 324 F.2d 566 (4th Cir. 1963). While we can envisage a case where such an effort is so justified by the record and rulings below that it, even though finally unsuccessful, should be given full weight in the award of fees, this is not that case. Were no discretion to be allowed the court, a plaintiff could vastly increase the fee burden on a defendant by pursuing a plethora of insubstantial claims.

In the light of this consideration, together with the only data we have been able to gather concerning other section 4 awards on appeal, *see* n. 2, we are satisfied that $4000 is a "reasonable attorney's fee" for plaintiff on appeal. That part of the claim based on plaintiff's post-trial activities in the district court is more appropriately addressed to that court.