# United States Court of Appeals

## For the First Circuit

No.  09-2684

UNITED STATES OF AMERICA,

Appellee,

v.

OVERSEAS SHIPHOLDING GROUP, INC.,

Defendant,

ZACK HAWTHORN,

Movant, Appellant.

ON APPEAL FROM AN ORDER REGARDING ATTORNEY'S FEES ENTERED IN THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Dyk,* and Thompson, Circuit Judges.

Zack Hawthorn, pro se.
Jonathan F. Mitchell, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for the
appellee.

October 18, 2010

*Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**. Zack Hawthorn ("Hawthorn") appeals from a district court decision limiting Hawthorn's legal fees under two contingent fee agreements. The district court barred Hawthorn from receiving a fee in excess of $25,000 under a contingent fee agreement with Benedict Barroso ("Barroso") and barred Hawthorn from recovering any fee at all under a contingent fee agreement with John Altura ("Altura"). We conclude that the district court did not err in finding Hawthorn's contractual fee amounts with respect to both clients to be excessive. However, we conclude that the district court abused its discretion in disallowing any fee from the representation of Altura. We hold that Hawthorn should receive a fee of $25,000 for each client and accordingly affirm-in-part and reverse-in-part.

## I.

This case arises out of a government investigation in six judicial districts into allegations that Overseas Shipholding Group, Inc. ("OSG") had for years engaged in the practice of discharging oil from its vessels in American waters and falsifying mandatory ship records to conceal the discharges, in violation of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1908(a).

In September of 2005, Barroso worked aboard the M/T Pacific Ruby ("the Pacific Ruby"), a tanker ship owned and operated by OSG. On September 15, 2005, Barroso telephoned the United

States Coast Guard on behalf of himself and three crew members (including Altura), all Filipino nationals ("the Texas whistleblowers"). Barroso reported that he had observed the chief engineer illegally bypassing the ship's oil pollution prevention equipment. Barroso told the Coast Guard that the four men were willing to testify against OSG. Based on Barroso's report, the Coast Guard conducted two boardings of the ship. The four Texas whistleblowers provided information that supported the allegations of illegal activity by OSG.

A grand jury investigation was commenced in the Eastern District of Texas in late 2005. A magistrate judge appointed separate counsel for each whistleblower from the district's Criminal Justice Act ("CJA") panel. On October 7, 2005, Hawthorn was appointed to represent Barroso, and another lawyer, Bill Harris ("Harris"), was appointed to represent Altura. The scope of the representation in each case was to determine whether the client was a target or subject of a criminal investigation, to advise him of his Fifth Amendment rights, and to assist him in his appearance before the grand jury and during interviews with the government.

Based on the Texas whistleblowers' testimony, in August of 2006, the chief engineer of the Pacific Ruby, Kun Yun Jho, and OSG were indicted in the Eastern District of Texas on charges of conspiracy under 18 U.S.C. § 371, false statements under 18 U.S.C. § 1001, and violations under APPS, 33 U.S.C. § 1908(a). The APPS

case against OSG was then expanded to include a dozen OSG ships involved in oil dumping incidents in five other judicial districts, including the District of Massachusetts. Twelve whistleblowers in total provided information as to the incidents that formed the basis for the charges in the six districts.

The APPS, 33 U.S.C. § 1908(a), provides that "[i]n the discretion of the Court, an amount equal to not more than 1/2 of [a criminal APPS] fine may be paid to the person giving information leading to conviction." In November and December of 2006, government counsel informed Hawthorn that Barroso might be eligible for a monetary whistleblower award under the APPS. As a result, Hawthorn learned for the first time that his client might receive an award. However, on December 4, 2006, the Eastern District of Texas dismissed the APPS counts against OSG and the government appealed. See United States v. Kun Yun Jho & Overseas Shipholding Grp. Inc., 465 F. Supp. 2d 618 (E.D Tex. 2006).[1] On December 19, 2006, the government announced an agreement covering the six districts in which OSG was under investigation, including the District of Massachusetts and the Eastern District of Texas.[2] With respect to the cases other than the Texas case, the agreement specified that the parties would recommend that the five cases be

_____

[1] The Fifth Circuit ultimately reversed and reinstated the APPS charges. See United States v. Kun Yun Jho & Overseas Shipholding Group, Inc., 534 F.3d 398 (5th Cir. 2008).

[2] The other four districts were: the Central District of California, the Northern District of California, the District of Maine, and the Eastern District of North Carolina.

-4-

consolidated in Massachusetts for plea and sentencing. OSG agreed to plead guilty to representative APPS counts in each of the five cases. Under the terms of the agreement, OSG would pay a total monetary fine of $27.8 million, of which $10.5 million was allocated to APPS violations. The agreement also provided that if the Fifth Circuit reversed the Texas dismissal of the three APPS counts, OSG would plead guilty to those counts as well and a fine under the APPS of $2.4 million would be imposed. If not, OSG would instead plead guilty in the Eastern District of Texas to three additional counts of making false statements in violation of 18 U.S.C. § 1001. The agreement left open the possibility that an additional fine would be imposed in the Texas proceeding. The agreement contemplated that a single plea and sentencing proceeding for the five cases would be scheduled in the Massachusetts district court in the near future, at which time that court would consider whistleblower awards.

On January 3, 2007, Hawthorn sent Barroso an email in which he informed Barroso of the plea agreement and that he might be eligible for a whistleblower award. Hawthorn added that he could represent Barroso in pursuing any legal rights he might have to a whistleblower award, but that his representation would be separate from his court-appointed representation. The email stated that despite the dismissal in the Eastern District of Texas, Hawthorn thought that Barroso could still be compensated in the

Massachusetts proceeding, but that the possibility of recovery was uncertain. Because Barroso was indigent, Hawthorn proposed representation on a contingent fee basis whereby he would receive 33% of whatever award Barroso received. A proposed contingent fee agreement was attached. Hawthorn also stated that he could not begin working for Barroso on the whistleblower award matter until Hawthorn received a signed copy of the agreement. Barroso responded, stating that he needed to discuss the matter with the other three whistleblowers with whom he was associated.

On January 29, 2007, the five pending cases (other than the Texas case) were consolidated and the plea and sentencing hearings were set for March 21, 2007, in Boston. On March 9, 2007, government counsel contacted Hawthorn, along with the lawyers for the other whistleblowers to advise them of the potential availability of the APPS awards in the Massachusetts case. On March 12, 2007, government counsel informed Hawthorn that the government was considering filing a motion in support of an award. That same day, since Hawthorn was not familiar with whistleblower proceedings, he asked government counsel for a sample of a motion filed on behalf of whistleblowers in other cases. The government provided Hawthorn with a sample motion filed by the government in another case.

On March 13, 2007, Altura contacted Hawthorn by email, introducing himself and requesting that Hawthorn represent him in

the upcoming whistleblower action on the same contingency terms that Hawthorn had proposed to Barroso, stating: "[I] would gladly appreciate if you could represent me in a legal matter concerning any claim from the Pacific Ruby Incident." Gov't's Suppl. App'x 251. He explained that he was having trouble reaching his court-appointed attorney (Harris) in the criminal case, stating that "I want to inform you that since I've joined this vessel I haven't heard from Bill Harris. That's why I've decided to ask you if you could represent myself." Id. at 252. Hawthorn did not attempt to contact Altura's court-appointed attorney nor did he contact the Texas district court. Hawthorn e-mailed Altura the fee agreement along with a conflict of interest waiver. Altura signed the fee agreement, which Hawthorn had dated March 13, 2007. On March 14, 2007, Barroso agreed to a fee agreement as well. Hawthorn advised both Altura and Barroso of a possible conflict of interest in representing both in the same matter, and they waived any conflicts of interest stemming from the joint representation.

On March 14 and 15, 2007, the government filed motions for whistleblower awards in the Massachusetts proceeding, detailing the contributions of all of the whistleblowers (i.e., the four whistleblowers in the Texas case and the eight whistleblowers in the other cases) and recommending that the court award $437,500 to each whistleblower. The government asked that the court award equal sums to each of the whistleblowers involved in the

consolidated cases as well as to the whistleblowers involved in the Eastern District of Texas case because the contributions of the twelve whistleblowers to the overall outcome of the case were roughly equal. This recommendation was made even though the whistleblowers from the Texas case, including Barroso and Altura, were not witnesses in any of the five cases consolidated in the District of Massachusetts and there had been no APPS conviction in the Eastern District of Texas.

On March 16, 2007, OSG filed a response to the government's whistleblower motion, stating that though it did not oppose the government's motion, it was concerned about a grant of awards to the whistleblowers in the Texas case. OSG argued that any APPS awards to those individuals should be administered by the district court in Texas. On March 19, 2007, the government replied, explaining that because the four Texas whistleblowers contributed to the successful overall resolution of the case against OSG, the Massachusetts district court had discretion to issue awards to them. That same day, Hawthorn filed a nine-page memorandum responding to OSG, and arguing that Barroso and Altura deserved awards because they contributed to OSG's plea of guilty in the consolidated case. Hawthorn also pointed out that all of the APPS counts that were pending in the Eastern District of Texas had been dismissed and as it currently stood, there were no awards to be administered by that court. He argued that even if the

dismissal were overturned, Altura and Barroso would receive less in the Eastern District of Texas as the total amount of the fine there would be less than the fine from the consolidated cases, even though Barroso and Altura contributed to the overall result.

The plea and sentencing hearing was held on March 21, 2007. In accordance with the plea agreement, the district court imposed a fine of $10.5 million for APPS violations. Under the statue one-half of the total was available for awards to whistleblowers. At the hearing, OSG argued that the Texas whistleblowers should not receive whistleblower awards. The government urged the district court to award fees to all twelve whistleblowers. The court then voiced "a modest reservation" about issuing awards to the Texas whistleblowers. Gov't's Suppl. App'x 159. The court heard from Hawthorn, who argued for an award to Barroso and Altura. The district court then concluded it would make the whistleblower awards as proposed by the government. On May 25, 2007, the court issued an order authorizing awards of $437,500 to each of the twelve whistleblowers, and further ordered that "any proposed legal fees in excess of $10,000 for legal services performed in connection with the granting of the whistleblower awards in this case, must be approved by the Court after notice to the government." United States v. Overseas Shipholding Grp., Inc., No. 1:06-cr-10408-RGS (D. Mass. May 25, 2007) (order concerning whistleblower awards).

On August 15, 2007, Hawthorn filed a motion for approval of attorney's fees in which he sought to receive one third of the whistleblower awards to Barroso and Altura, for a total of $291,677 in legal fees. No other counsel for the whistleblowers sought approval for a fee in excess of $10,000. Barroso and Altura did not object to Hawthorn's fees at the time. The government opposed Hawthorn's request on the ground that the fees were unethically excessive.

The district court referred the matter of Hawthorn's fee request to a magistrate judge for a recommendation. On April 22, 2008, after conducting an evidentiary hearing, the magistrate judge issued a memorandum and order finding that Hawthorn's requested fees were "unethically excessive," and recommending reducing the fees to $25,000 for each client for a total of $50,000, a figure that represented the "outer limit of reasonableness." United States v. Overseas Shipholding Grp., Inc., 547 F. Supp. 2d 75, 91 (D. Mass. 2008) (opinion of magistrate judge) (quotations omitted). However, the magistrate judge requested that the district court for the Eastern District of Texas determine whether it would violate that court's CJA plan if Hawthorn were to receive a contingent fee for representing Barroso in the whistleblower matter. The Eastern District of Texas eventually advised that Hawthorn's contingent fee

agreement with Barroso did not violate the terms of the CJA plan. The magistrate judge adopted this ruling.[3]

On December 1, 2009, the district court adopted the magistrate's recommendation in part. United States v. Overseas Shipholding Grp., Inc., 672 F. Supp. 2d 188 (D. Mass. Dec. 1, 2009). The court held that the $50,000 award for legal services to both men "approach[es], if not exceed[s], the limits of reasonable compensation under the circumstances," but stated that it would defer to the magistrate judge in setting the "baseline figure." Id. at 197. (In the following discussion, we refer to the portions of the magistrate's recommendation adopted by the district court as the district court's decision.)

However, the district court sua sponte further held that because Altura may still have been represented by Harris in the same matter at the time that Hawthorn sent him a contingent fee agreement, and because Altura may not have fully understood his

_____

[3] On June 23, 2008, without filing an objection in the district court to the Magistrate Judge's order, Hawthorn filed a notice of appeal directly with this court. On September 18, 2009, this court dismissed his appeal for lack of jurisdiction. On October 7, 2008, Hawthorn filed an objection to the Magistrate Judge's order in the district court.

Although Hawthorn failed to object to the Magistrate Judge's report within ten days, see Fed. R. Civ P. 72(b)(2), the failure to timely file an objection is not jurisdictional. See Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 174 (2d Cir. 2000); United States v. Polishan, 336 F.3d 234, 239-40 (3d Cir. 2003); Souter v. Jones, 395 F.3d 577, 585 (6th Cir. 2005); Allen v. Sybase, 468 F.3d 642, 658 (10th Cir. 2006); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

legal interests, Hawthorn "violated the spirit, if not the letter, of two, and perhaps three, attorney disciplinary rules," namely Mass. R. Prof'l. C. 4.2 (concerning communications with represented persons), 4.3(b) (prohibiting legal advice to potentially conflicted persons), and 7,3(b) (prohibiting solicitation of professional employment from impaired persons). Id. at 198-99. The district court accordingly disallowed the $25,000 awarded to Hawthorn for services rendered to Altura.

Hawthorn timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

**II.**

Hawthorn first argues that the district court lacked the authority to adjudicate the propriety of the contingent fee agreements because neither Barroso nor Altura objected. Hawthorn posits that there was never any "case" or "controversy" to be decided, and that accordingly the district court lacked jurisdiction. See, e.g., Moore v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 47, 48 (1971) (finding no case or controversy under Article III of the United States Constitution where "both litigants desire[d] precisely the same result"). Hawthorn's argument is premised on the Fifth Circuit's holding in Brown v. Watkins Motor Lines, Inc., 596 F.2d 129, 131 (5th Cir. 1979). In Brown, the Fifth Circuit held that where the parties agreed to the fee arrangement there was no case or controversy, and that the district

-12-

court lacked jurisdiction to adjudicate the amount to be paid to the plaintiff's lawyer. Id.

We disagree with Brown, and its approach has been previously rejected by this court. It is well-established that a district court has inherent authority to supervise the conduct of attorneys that appear before it. See United States v. Klubock, 832 F.2d 664, 667 (1st Cir. 1987) (en banc). Both this court and other courts of appeals have held that this supervisory authority encompasses the power to assess the fairness of attorney fee agreements, including contingent fee arrangements. See, e.g., Bos. & Me. Corp. v. Sheehan, Phinney, Bass & Green, P.A., 778 F.2d 890, 896 (1st Cir. 1985) ("Contingent fees are, of course, of special concern to courts and are subject to strict judicial supervision."); Farmington Dowel Prods. Co. v. Forster Mfg. Co., 421 F.2d 61, 87 (1st Cir. 1969) ("Farmington Dowel I").[4] This is so because "[c]ourts have a stake in attorney's fees contracts; the fairness of the terms reflects directly on the court and its bar." Rosquist v. Soo Line R.R., 692 F.2d 1107, 1111 (7th Cir. 1982). Thus, a court "has a particular interest in assuring itself that it

---

[4] See also McKenzie Constr., Inc. v. Maynard, 758 F.2d 97, 101 (3d Cir. 1985) ("Because courts have special concern to supervise contingent attorney fee agreements, they are not to be enforced on the same basis as ordinary commercial contracts."); In re A.H. Robins Co., 86 F.3d 364, 373 (4th Cir. 1996) ("The district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established.").

is not an unwitting accessory to an excessive fee." Farmington Dowel I, 421 F.2d at 87.

As this court explained in Farmington Dowel I, "courts generally are not without power to modify excessive fee arrangements." Farmington Dowel I, 421 F.2d at 87-88. While a court is not obligated in every case to ask whether a fee arrangement provides for excessive fees, "a court may in its discretion inquire into such issue, particularly when it is brought to the court's attention." Id. Further, this supervisory power is not dependent on whether a party challenges a fee arrangement. To the contrary, "it seems clear that the court's power to prevent excessive fees must be operative regardless of the arrangement by which the fee is obtained." Id. at 87. Thus, whether a client objects to a fee arrangement is relevant to whether the fee is excessive, but it is "not controlling, for the object of the court's concern is not only a particular party but the conformance of the legal profession to its own high standards of fairness." Id. at 90 n.62. We conclude that the district court had the authority to review the fee agreements even though the clients did not object at the time.

## III.

We review the district court's exercise of its supervisory authority for abuse of discretion. See De Jesus Nazario v. Morris Rodriguez, 554 F.3d 196, 199 (1st Cir. 2009);

-14-

Ramos Colon v. Sec'y of Health & Human Servs., 850 F.2d 25, 26 (1st Cir. 1988).

Unlike awards under the fee-shifting statutes, where fees are normally limited to "reasonable" compensation, fee awards stemming from privately negotiated attorney's fees agreements are reviewed deferentially. The court may exercise its supervisory power to reduce a fee only in exceptional circumstances. Sargeant v. Sharp, 579 F.2d 645, 648 n.4 (1st Cir. 1978). Thus, "if the Court finds that an agreement provides for an unethically excessive fee, it may sparingly exercise its supervisory powers over the bar to limit the amount the attorney may actually receive." Id. at 648. The power to review fees pursuant to an agreement is not limited to situations in which the fee is ethically excessive at the inception but extends to situations in which "the unreasonableness is due to factors that occur after the fee arrangement is made." McKenzie, 758 F.2d at 101.

While we do not think the fee here was ethically excessive, the court's supervisory power is not limited to the situation in which the fees are ethically excessive. Courts can limit the fee on the ground that it exceeds the outer limit of reasonableness even if it is not ethically excessive. McKenzie, 758 F.2d at 100-01 (3rd Cir. 1985); Green v. Nevers, 111 F.3d 1295, 1302 (6th Cir. 1997). In these circumstances, the court is determining whether the fee "has resulted in such an enrichment at

the expense of the client that it offends a court's sense of fundamental fairness and equity." McKenzie, 758 F.2d at 101. A fee can exceed the outer limit of reasonableness "without necessarily being so 'clearly excessive' as to justify a finding of a breach of ethics." Id. at 100; Green, 111 F.3d at 1302.

Although limitations on fees should only be imposed in exceptional circumstances, they are particularly appropriate in situations such as this where awarding an excessive fee to the attorney would itself undermine the objectives of the federal statutory scheme. The whole purpose of the discretionary award to whistleblowers under this statute is to create incentives for the whistleblower to take risks that may disadvantage the whistleblower in his relationship to his employer. The amount of the fee that will be siphoned off by the lawyer significantly affects the size of that award and the power of the incentive. The court in administering this statute is obligated to ensure his excessive legal fees will not diminish the statutory incentive.

In determining whether an attorney's fee is clearly excessive, this court has held that courts should consider a variety of factors to determine the "outer limit" of reasonableness:

1. the time and labor required, the novelty and difficulty of the questions involved and the necessary skill level;

2. whether work on the case would preclude the attorney's performing other work;

3. the customary charges of the Bar for similar services;

4. the amount involved in the controversy;

5. the contingency or the certainty of the compensation; and

6. the character of the employment, whether casual or for an established and constant client.

Farmington Dowel I, 421 F.2d at 89. (adopting factors listed in Farmington Dowel Prods. Co. v. Forster Mfg. Co., 297 F. Supp. 924, 926 n.1 (D. Me. 1969)).[5]  For the purposes of determining whether a fee is excessive, "the fee arrangement should be viewed to some extent according to the circumstances in which it was made."  Id.; see also  Bos. & Me. Corp., 778 F.2d at 898 ("To deny [a] fee . . . because it exceeds time charges and looks high in hindsight would penalize [an attorney] for a job well done . . . ." (emphasis in original)).  However, a court may nonetheless consider "post-agreement factors such as complexity of problems, quality of work, and results obtained."  Farmington Dowel Prods. Co. v. Forster Mfg. Co., 436 F.2d 699, 701 (1st Cir. 1970) ("Farmington Dowel II"); see also McKenzie, 758 F.2d at 101.

---

[5]      We note that these factors are similar to those used by Massachusetts courts to determine whether a fee is "clearly excessive."  See Mass R. Prof'l Conduct 1.5(a) (listing eight factors to consider).

**IV.**

Hawthorn contends that the district court applied an improper standard in evaluating the fee agreements. There is no merit to the contention that the district court improperly applied the criteria from the fee-shifting statutes (which look to the reasonableness of the fee). The magistrate judge's opinion explicitly rejected that standard, noting that "the Court is applying the more 'deferential' standard applicable to contingent fee agreements rather than the 'reasonable compensation' standard applicable to determining fee awards pursuant to fee shifting statutes." See Overseas Shipholding, 547 F. Supp. 2d at 91. The magistrate judge's opinion, adopted in this respect by the district court, also looked to the pertinent factors as set forth in Farmington Dowel. There is no requirement that all of the listed factors be explicitly considered, especially when not appropriate to the particular case, and we have clearly stated that it can be appropriate to consider additional factors. See Farmington Dowel I, 421 F.2d at 89.

The district court's factual findings are, of course, reviewed under a clearly erroneous standard. Cumpiano v. Banco Satander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990). We see no error in the district court's findings with respect to the specific factors.

First, there was no clear error in finding that the time and labor actually expended were not significant. See Overseas Shipholding, 672 F. Supp. 2d at 195. The record reflects that Hawthorn performed little or no substantive work on the whistleblower claims until approximately one week before the sentencing hearing on March 21, 2007. Hawthorn was contacted by Altura on March 13, 2007, and received the signed agreement from him the same day. Hawthorn did not receive the signed agreement from Barroso until March 14, 2007, and represented in an email to Barroso that he could not begin work on the whistleblower award matter until he received a signed agreement. Between March 13, 2007 and the sentencing hearing on March 21, 2007, a period of only 8 days, Hawthorn worked on a nine-page memorandum during parts of two days. On March 20, 2007, he traveled to Boston and met with local counsel concerning the sentencing hearing. On March 21, 2007, he argued at the sentencing hearing. Hawthorn maintained below that he devoted a significant amount of time to communicating with his clients in order to prepare his arguments. However, the district court rejected this claim as "implausible." Overseas Shipholding, 547 F. Supp. 2d at 90 n.8; see Overseas Shipholding, 672 F. Supp.2d at 195 nn.14 & 16.

Second, there was no clear error in finding that there was no significant risk that substantial additional time and effort might be required. Hawthorn contends that there was a possibility

-19-

of a trial-type hearing pursuant to <u>Miller</u> v. <u>United States</u>, 455 F.2d 833 (4th Cir. 1971). In <u>Miller</u>, the Fourth Circuit held that where individuals had monetary claims pursuant to a whistleblower provision of the Refuse Act, 33 U.S.C. § 411, the due process clause of the Fifth Amendment guaranteed those individuals the "right to confront and to cross-examine adverse witnesses, the right to participate in the proceedings by counsel and to adduce relevant, admissible evidence in their own behalf, and the right to a decision based upon evidence adduced at such a hearing." <u>Miller</u>, 455 F.2d at 836. Even if we were to assume that <u>Miller</u> was correctly decided and that it applied to the whistleblower provision of the APPS (both dubious propositions), there was no showing that at the time the agreements were executed Hawthorn intended to request a trial-type hearing in the Massachusetts proceeding.

Indeed, the evidence is to the contrary. Hawthorn's March 12, 2007, correspondence with the government, which took place shortly before the agreements were executed on March 13 and 14, shows that he intended to largely piggyback on the government's efforts and that he was aware that substantial effort on his part would not be required. In that correspondence, he asked the government for a sample motion in support of a whistleblower award, which he received and used to prepare his motion. He also noted that he would wait until the government had filed its sentencing

memorandum before he filed his, stating: "I trust you would set forth everything fairly and accurately because your knowledge of the case is substantially greater than mine." Overseas Shipholding, 547 F. Supp. 2d. at 81. Hawthorn's January 3rd email to Barroso stated that "I expect . . . expenses to be minimal." Id. at 80. This statement is strong evidence that a trial-type proceeding was not anticipated. There is no error in the district court's finding that as of the time when Hawthorn executed the contracts with Barroso and Altura, "Hawthorn must have known that he did not face depositions, discovery or a protracted trial" and that he "should have been aware that his efforts would be limited to filing a sentencing memorandum and presenting an argument at sentencing." Id. at 88.

Hawthorn also argues that there was a possibility of significantly more work under the agreements as both agreements provided that Hawthorn would represent Barroso and Altura in the event of an appeal. Even if we were to assume that Barroso and Altura had a right to appeal the denial of a Massachusetts award, any such appeals would not likely require significant work on Hawthorn's part, given the government's lead role.

Hawthorn also contends that if his efforts to secure compensation in Massachusetts were ineffective, he would have been obligated to proceed in Texas. Additionally, he notes that as the Fifth Circuit has now overturned the dismissals in Texas, an

-21-

additional criminal fine may be imposed, and Barroso and Altura may now, if they choose, seek whistleblower awards in Texas. Hawthorn suggests the he is still obligated under the contracts to file and litigate these claims if his clients so choose, and therefore, his work under the contracts may not yet even be completed. But again, assuming that this is so, this can not affect the propriety of the fee in the Massachusetts proceeding. The district court did not abuse its discretion in assessing the excessiveness of Hawthorn's fee exclusively with respect to work performed in the Massachusetts proceeding. If Hawthorn were to eventually secure an additional award from the Eastern District of Texas on behalf of his clients (perhaps an unlikely eventuality), under the fee agreements he would be entitled to a third of the Texas award. The Eastern District of Texas could then, in an exercise of its discretion, inquire into the appropriateness of Hawthorn's compensation with respect to the work performed before that court. We see no error in evaluating the Massachusetts and Texas proceedings independently.

Third, the results obtained in the Massachusetts proceeding were quite beneficial to Hawthorne's clients. The APPS permits but does not require the district court to award compensation to whistleblowers who supply information "leading to conviction," 33 U.S.C. § 1908(a) (2006). In fact the Texas prosecution based on the information that Barroso and Altura

supplied to the government had been dismissed. See United States v. Jho, 465 F. Supp. 2d 618, 622-26 (E.D. Tex. 2006). OSG, moreover, objected to an award to the Texas wistleblowers. Despite these objections, Hawthorn's clients were awarded substantial sums. Nonetheless, the district court did not err in finding that the success achieved was largely due to the government's efforts. Hawthorn was not skilled in the relevant area of law. The record reflects that Hawthorn was unfamiliar with whistleblower awards until this case. He relied on the government's expertise and advocacy on behalf of the whistleblowers and acknowledged that the government's knowledge of the case was "substantially greater than [his]." Overseas Shipholding, 547 F. Supp. 2d at 80-81. It is clear that whether or not Barroso and/or Altura received an award was almost entirely dependent on the government's recommendations, and that Hawthorn's efforts had little effect. See id. at 91.

Fourth, the district court did not err in failing to accord more weight to the fact that a contingency fee of 33% is not unusual. While 33% contingent fees are not unusual as a general matter, there was no showing that such a fee was usual in the unique context of whistleblowing litigation or some similar context. Moreover, even an agreement that was "reasonable when made" is not necessarily "insulated from all attack" when "it yields a fee out of proportion to the extent or the benefit of services rendered." Farmington Dowel I, 421 F.2d at 89.

Fifth, the district court appropriately considered the circumstances under which the fee agreements were executed. As the magistrate judge observed, there was reason to question whether Barroso and Altura were in a position to make informed decisions about their representation. See Overseas Shipholding, 547 F. Supp. 2d at 87-88. Both men were foreign nationals who were sufficiently indigent to quality for court-appointed counsel. Further, both were out at sea when they signed the agreements and were disadvantaged in their ability to shop around for other representation. Although both were competent to retain counsel (as we describe below), the information discrepancy between Hawthorn and his clients suggests that Barroso and Altura were not in a position to make an informed decision about the appropriate level of compensation or to "shop around for other representation." Id. at 87; see Schlesinger v. Teitelbaum, 475 F.2d 137, 140 (3d Cir. 1973) (holding that contingent fee agreements were subject to heightened scrutiny because of the vulnerabilities of seamen); In re Vioxx Prods. Liab. Litig., 574 F. Supp. 2d 606, 612 n.12 (E.D. La. 2008) (noting that "federal courts have long endeavored to protect seamen from unfair contingent fee contracts").

Sixth, the district court did not err in finding that the contingent nature of the representation did not justify a higher award. As we have noted, the fact that a fee arrangement is contingent upon success is a relevant factor in determining the

appropriate fee level.  See Farmington Dowel I, 421 F.2d at 90. The reason is that "the fact that the attorney is willing to take an all-or-nothing arrangement might justify a fee which is higher than the going hourly rate in the community."  Id.  Though this factor favors a higher fee for Hawthorn than the usual hourly rate, the district court did not err in finding it not to be significant. In assessing whether a contingent fee award is excessive, we consider whether the attorney faced meaningful risk.  See Bos. & Me. Corp., 778 F.2d  at 897.  Here, there was indeed a risk of no recovery because (as noted earlier) there was an issue as to whether the Massachusetts district court had the authority to grant awards to Barroso and Altura.  Despite these hurdles, the amount of the contributions Hawthorn could have, and did make, in this case were "necessarily finite."  Overseas Shipholding, 547 F. Supp. 2d at 89.  The size of an appropriate contingent fee award should be determined in part by multiplying the expected number of hours of work times the usual hourly rate, increased to take account of the possibility that the attorney's efforts might not be successful. Cf. Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 337 (1st Cir. 1997).  Hawthorn has made no showing that a $25,000 fee for each client (for a total of $50,000) is insufficient to take account of the contingent nature of the agreement.

Finally, there was no evidence that the representation precluded other employment by Hawthorn, or that other factors would

justify the claimed fee. To be sure, the record reflects that at least as of the time that Hawthorn moved for approval of his fees, his clients wished the agreements to be enforced. As noted above, a client's willingness to abide by the fee arrangement is relevant but not controlling. Farmingtown Dowel I, 421 F.2d at 90 n.62. Rather, in reviewing the propriety of fee agreements, the key issue is "the conformance of the legal profession to its own high standards of fairness." Id. The magistrate judge did not abuse his discretion in discounting the clients' agreement, especially in light of the indigent status of both clients.

In conclusion, the district court did not err in considering the relevant factors and did not abuse its discretion in concluding that Hawthorn's requested fees were excessive. Nor did the district court err in concluding that fees of $25,000 for each client was an appropriate figure representing the outer limit of reasonable compensation under the circumstances.

## V.

Hawthorn contends that the district court abused its discretion in further reducing his share of Altura's award from $25,000 to zero. Though "[d]enial of attorneys' fees may be a proper sanction for violation of an ethical canon," Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 95, 97 (1st Cir. 1988), we conclude that Hawthorn did not violate any ethical canons.

When Hawthorn was admitted pro hac vice to appear before the district court, he became subject to the Massachusetts Rules of Professional Conduct, which the District of Massachusetts has adopted. See Local Rules for the District of Massachusetts 83.6(4)(b). The district court denied Hawthorn a fee for his representation of Altura on the ground that "Hawthorn's conduct . . . violated the spirit, if not the letter, of two, and perhaps three, attorney disciplinary rules," namely Massachusetts Rules of Professional Conduct 4.2, 4.3, and 7.3. Overseas Shipholding, 672 F. Supp. 2d at 197-98.

Mass. R. Prof'l. Conduct 4.2 states that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The district court seemed to believe that Altura was represented by his CJA counsel, Harris, in the same matter as in which Hawthorn agreed to represent Altura. The record is unclear whether Altura was still represented by Harris in the Texas criminal matter at the time that he became Hawthorn's client. However, the whistleblower claim was not the "same matter" in which Harris represented Altura. The record indicates that Harris was appointed under the Criminal Justice Act to represent Altura and to determine whether Altura was a target or subject of a criminal investigation, to advise him of

his Fifth Amendment rights, and to assist him in his appearance before the grand jury and during interviews with the government. The magistrate judge in Massachusetts adopted the Eastern District of Texas' conclusion that Barroso's whistleblower claim was not the "same matter" as the CJA representation by Hawthorn. If that was the case for Barroso, then certainly Hawthorn's representation of Altura for his whistleblower claim in Massachusetts was not the "same matter" for which Harris had been appointed to represent him.

Since the criminal representation was not the same matter as the whistleblower compensation proceedings, we do not think that Hawthorn had any obligation to contact Hawthorn's criminal counsel, or to assist Altura in doing so as the district court suggested. Moreover, Altura had already attempted to get in contact with Harris and had indicated to Hawthorn that Harris was unresponsive. There is a strong public interest in permitting an individual to obtain the counsel of his choice. See Wheat v. United States, 486 U.S. 153, 164 (1988); Morris v. Slappy, 461 U.S. 1, 22-25 (1983). The sentencing hearing was rapidly approaching and Altura was entitled to secure counsel to represent him in that proceeding. Requiring Hawthorn to contact previous counsel or to insist that Altura make such a contact might interfere with Altura's ability to obtain counsel in time for the sentencing hearing. Requiring new counsel to contact previous counsel or to insist that the client do so might, in fact, subject the client to importuning from previous

counsel to retain him in connection with the new matter, even where the client had decided that he did not want previous counsel to represent him in the new matter. While courtesy might typically suggest that previous counsel be informed of the new representation, we hold that Hawthorn had no duty to contact Altura's counsel in the Texas criminal matter or to require Altura to do so, and accordingly, he did not violate the letter or spirit of Mass R. Prof'l Conduct 4.2.

Mass. R. Prof'l. Conduct 4.3 states that "[i]n dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested." The district court seemed to believe that Hawthorn violated the spirit of this rule by communicating with Altura although he was already representing Barroso. We see no basis for concluding that Hawthorn violated either the letter, or the spirit, of this rule. Altura already knew that Hawthorn was representing Barroso—there was no need for Hawthorn to inform him of that fact.

Rule 4.3(b) states that "[d]uring the course of representation of a client, a lawyer shall not give advice to an unrepresented person, other than the advice to secure counsel, if the interests of that person are or have a reasonable possibility of being in conflict with the interests of the client." Nothing in the record shows that Hawthorn gave any advice to Altura before he was engaged to represent Altura, other than to secure counsel.

Hawthorn told both clients about a potential conflict of interest, and they both waived those possible conflicts.

Mass. R. Prof'l Conduct 7.3(b) provides that "a lawyer shall not solicit professional employment if . . . the lawyer knows or reasonably should know that the physical, mental, or emotional state of the prospective client is such that there is a substantial potential that the person cannot exercise reasonable judgment in employing a lawyer." Hawthorn did not solicit business from Altura; Altura sought Hawthorn out. There is no basis for concluding that Altura was incapable of "exercis[ing] reasonable judgment in employing a lawyer." A contrary approach would deprive individuals in Altura's position of the opportunity to secure legal representation. If Barroso was capable of employing Hawthorn, as the district court assumed, so was Altura.

We therefore hold that the district court abused its discretion in disallowing Hawthorn from recovering a fee from his representation of Altura. He should receive a fee of $25,000 for his representation of Altura.

## VI.

For the foregoing reasons, we affirm the district court's approval of fees in the amount of $25,000 for Hawthorn's representation of Barroso. We reverse the district court's disapproval of any fee for the Altura representation, and hold that

-30-

Hawthorn may collect $25,000 in fees from his representation of Altura.

<u>Affirmed-in-part, reversed-in-part, and remanded.</u>